Karen BONITZ, et al.,
Plaintiffs, Appellees,

v.

Michael V. FAIR, et al.,
Defendants, Appellants.

Karen BONITZ, et al.,
Plaintiffs, Appellees,

v.

Michael V. FAIR, et al.,
Defendants, Appellees.

Appeal of William SHAUGHNESSY,
Defendant, Appellant.

Nos. 85–1746, 85–1809.

United States Court of Appeals,
First Circuit.

Heard April 10, 1986.
Decided Nov. 3, 1986.

Roberta Thomas Brown, Legal Counsel to the Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., was on brief for defendants, appellants Fair, Holbrook, Trabucco, Agnes, Droney, Canty, Bettencourt, Butterworth, Coalter, Washburn and Gendron.

J. Richard Ratcliffe with whom Richard L. Zisson and Zisson and Veara, were on brief for defendant, appellant William Shaughnessy.

John Reinstein, Mass. Civil Liberties Union Foundation, with whom Ann Lambert Greenblatt, Mass. Correctional Legal Services, Inc., Robert E. Fast, Hale & Dorr, Robert Sherman, Lawyer's Committee for Civil Rights Under Law of the Boston Bar Ass'n, and Judith Mizner, Nancy Gertner and Silverglate, Gertner, Baker, Fine & Good, were on brief for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, and COFFIN and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

This case concerns a wide-ranging search conducted at the Massachusetts Correctional Institution at Framingham (Framingham), a medium security prison for women and men. Plaintiffs-appellees, nine female inmates, claim inter alia violations of their federal constitutional rights by twelve officers and officials of the Massachusetts Department of Correction, the Massachusetts State Police Department, and the Office of the Middlesex County District Attorney.[1]

---

1. The defendants from the Department of Correction are Michael Fair (Commissioner), Terrence Holbrook (Framingham Superintendent), Fred Butterworth (Deputy Commissioner), Brian Gendron (Associate Commissioner of Operations), Arnold Bettencourt (Framingham Deputy Superintendent), William Coalter (Chief of Security), and Linda Washburn (special investiga-

The district court granted defendants' motion for summary judgment as to most of the claims,[2] but denied the motion as to the plaintiffs' fourth amendment claim that they were unreasonably searched. The court also rejected the defendants' assertion that they were entitled to qualified immunity on that claim. Defendants appeal the denial of their claim of immunity. Although appeals from denials of summary judgment are generally not permitted, the Supreme Court in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), created a narrow exception allowing interlocutory review of denials of immunity for government officials. We therefore have jurisdiction, subject to the *Mitchell* constraints. After reviewing those constraints, we discuss the narrow issue before us and, finding that the constitutional right to be free from an abusive strip search was clearly established at the time of the search, we affirm.

### I.

■■■ Our jurisdiction in this case is premised on the district court's denial of the defendants' claim of qualified immunity. Government officials performing discretionary functions may be shielded from liability for civil damages in a § 1983 action by the doctrine of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984) (immunity standard of *Harlow* applies in § 1983 actions). An official is entitled to immunity if, at the time of the challenged action, the statutory or constitutional right allegedly violated was not "clearly established". *Harlow*, 457 U.S. at 818, 102 S.Ct.

at 2738; *Blackburn v. Snow*, 771 F.2d 556, 569 (1st Cir.1985). The district court found that the right allegedly violated was clearly established at the time, and it therefore denied defendants' claim of immunity.

In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court carved out a narrow exception to the general rule that a case should be carried to conclusion before asserted errors can be reviewed. Recognizing the collateral and conclusive nature of the question of qualified immunity, *id.* 105 S.Ct. at 2816–17, as well as the fact that the policy behind immunity would be vitiated if an official was required to stand trial for violating a right that was not clearly established at the time, *id.* at 2815–16, the Court determined that a denial of qualified immunity, "to the extent that it turns on an issue of law", *id.* at 2817, was an appealable final decision. Thus, if scrutiny of a plaintiff's allegations indicates that, even if the alleged acts are proven, qualified immunity exists, the official should be spared the burden of further proceedings.[3]

In creating this exception to the final-judgment rule, the *Mitchell* Court carefully circumscribed the role of the appellate court. We are not to "consider the correctness of the plaintiff's facts, nor even determine whether the plaintiff's allegations actually state a claim." *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Instead, the issue before us is purely legal: "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions". *Id.* 105 S.Ct. at 2816 & n. 9. Thus, we must determine whether, assuming plaintiffs are able to prove the acts attributed to each defendant, the de-

---

tor). From the Department of Public Safety, the defendants are Frank Trabucco (Commissioner), James Canty (state police colonel), and William Shaughnessy (state police trooper). The remaining defendants are John Droney (Middlesex County District Attorney) and Peter Agnes, Jr. (Assistant District Attorney).

2. The district court dismissed the plaintiffs' claims based on the first, fifth, sixth, eighth, and fourteenth amendments.

3. For example, in *Mitchell*, the plaintiff alleged that the defendant had authorized a warrantless wiretap for national security purposes. Because the constitutionality of such wiretaps was an open question at the time they were allegedly authorized, the Court found that the defendant was entitled to qualified immunity.

fendants are nonetheless immune because at the time of the alleged abusive strip search plaintiffs' right to be free from such a search was not clearly established. *See Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456, 466 (1st Cir.1985) (for purposes of *Mitchell* review, "we must assume that there is liability upon the part of the defendants").

■ The dissent concludes that our review should encompass another question: whether each defendant's *conduct* violated clearly established law. Two factors persuade us, however, that the qualified immunity inquiry focuses not on the defendant's actions but on the right allegedly violated. First, the focus in *Mitchell* is on the alleged harm, and not on the defendant's precise conduct. The Court observed that "[t]he question of Mitchell's immunity turns on whether it was clearly established in November, 1970 ... that such wiretaps were unconstitutional," *id.* 105 S.Ct. at 2818, and it found that "[t]he legality of the warrantless domestic security wiretap Mitchell authorized ... was, at that time, an open question," *id.* at 2820. At another point, the Court noted that "[t]he legal determination that a given proposition of law was not clearly established at the time the defendant committed the alleged act does not entail a determination of the 'merits' of the plaintiff's claim that the defendant's actions were in fact unlawful." *Id.* at 2817 n. 10.

Second, to focus on conduct in the context of this case is really to address the issue of causation. With respect to defendant Shaughnessy, who had a minimal connection to the alleged abusive strip search, the dissent claims the proper question is "whether the law was 'clearly established' that doing those limited, preliminary things that are all Shaughnessy did was a violation of a constitutional right." But no one is suggesting that doing those preliminary actions is, in the abstract, a constitutional violation. The alleged violation is the abusive strip search. Thus, what the dissent is asking, in effect, is whether it was clearly established that Shaughnessy's actions were closely enough connected to the alleged search to be deemed the equivalent of actually doing it. And that, we suggest, is really to ask whether it was clearly established that Shaughnessy could be deemed a *cause* of the search. As discussed in Section IV, *infra*, we have no doubt that we are not to consider causation at this stage—even if it could be decided as a matter of law on undisputed facts. Indeed, we think *Harlow* represented a deliberate shift in focus *away* from an individual defendant's conduct—including whether he caused the harm—to the narrow issue of the right at stake, so that the immunity decision could be made by referring solely to the plaintiffs' allegations. We therefore do not accept the dissent's interpretation of *Mitchell*, which in this case would restore the issue of causation to the immunity inquiry.

■ The dissent questions not only our characterization of the qualified immunity question, but also our approach of considering only the plaintiffs' allegations rather than the undisputed facts as revealed by depositions, affidavits and other discovery materials. We think our reading of *Mitchell*—setting a narrow boundary on interlocutory review of a defendant's entitlement to immunity—is supported by both the Supreme Court's language and its goals. In footnote 9 of *Mitchell* the Court emphasizes that "the appealable issue is a purely legal one: whether the facts *alleged* (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law (emphasis added)." 105 S.Ct. at 2816. The only deviation *Mitchell* allows from the focus on the facts as alleged in the complaint is in a case where the district court accepted the defendant's view of the facts and, even then, found that plaintiffs had a clearly established right to be free from the described harm. *Id.*

This interpretation—accepting at face value the facts as presented by one party and limiting the immunity inquiry to the clarity of the right violated—is consistent with the Supreme Court's instruction to resolve the immunity question before dis-

covery or trial, *Harlow,* 457 U.S. at 816–18, 102 S.Ct. at 2737–38. It does not, of course, foreclose the defendant from raising the issue of qualified immunity again, on appeal from final judgment, if the facts revealed through discovery or proven at trial diverge from the plaintiffs' allegations. The critical point for us is that *Mitchell* envisions the *interlocutory* appeal of qualified immunity as a straightforward matter of assessing the law and not as a procedure for sorting out facts—even for the purpose of determining whether they are undisputed.

Moreover, we do not believe that limiting review to the *alleged* facts is as problematic as the dissent suggests. The dissent's difficulty stems from its contention that the qualified immunity question involves scrutiny of each defendant's conduct. But since, in our view, immunity depends only upon the clarity of the right allegedly violated, the only "facts" we need to know are those that constitute the harm alleged by the plaintiff. It does not matter if the facts as alleged overstate the involvement of an individual defendant. If so, and if the defendant is later found not to have caused the alleged harm, that defendant will win on the merits. What concerns us in our narrow interlocutory review is whether, if what the plaintiff says happened really happened, is the defendant nevertheless immune because the harm was not a clearly established constitutional or statutory violation. Although limiting the immunity inquiry to the allegations and to the clarity of the alleged right may mean that fewer officials are entitled to interlocutory appellate review of their claims of no liability, we nevertheless think this approach represents the balance struck by the Supreme Court in resolving a complicated problem.[4]

4. The dissent claims that footnote 13 in *Mitchell* shows that the Supreme Court did not rely solely on the complaint allegations. In the footnote, the Court described a district court hearing on whether the disputed wiretap served a prosecutorial function, and thus fell within the scope of absolute immunity, or whether it was only to gather intelligence for national security purposes, for which only qualified immunity was possible. Unlike this case, where the complaint fully detailed the nature of the strip search, the complaint in *Mitchell* apparently alleged generally that the wiretap violated the Fourth Amendment and the Omnibus Crime Control and Safe Streets Act, *see* 105 S.Ct. at 2810, and lacked allegations concerning the wiretap's purpose—an essential factor in determining the nature of the alleged harm. To determine the proper immunity question, the district court (as well as the appeals courts) needed more information. Thus, the Supreme Court did not look beyond plaintiffs' allegations other than to the extent necessary to determine the nature of the alleged harm. That is not inconsistent with our view of the immunity inquiry. If in the case before us plaintiffs alleged only that they were subjected to a strip search, the district court would have needed more information before determining whether plaintiffs had a clearly established right to be free from the harm, since there was no doubt that some strip searches were constitutional.

Nor are our own cases of *Floyd v. Farrell,* 765 F.2d 1 (1st Cir.1985) and *DeAbadia v. Izquierdo Mora,* 792 F.2d 1187 (1st Cir.1986) contrary precedent for conducting the qualified immunity inquiry based solely on a complaint that sufficiently describes the alleged harm. *Mitchell* superseded *Floyd,* which was decided on the same day as *Mitchell* and thus was written without the benefit of the Supreme Court's analysis. In *DeAbadia,* as in *Mitchell,* the alleged harm needed to be made more specific in order for a court to ask the immunity question. DeAbadia's claim of improper demotion was actionable only if her job was one for which political affiliation is not a proper criterion. Because her complaint insufficiently described her job, we needed to consider more than her allegations in order to determine whether it was clearly established that she had a right to be free from discharge for political reasons. The additional material considered—the certified job description—was undisputed (although plaintiff contested its legal significance).

We concede that *Mitchell* offers no guidance on how a court should flesh out the alleged harm when the allegations fail to describe it sufficiently. Of course, when the allegations lack even "a minimal factual setting," the district court may dismiss the case. *Dewey v. University of New Hampshire,* 694 F.2d 1, 3 (1st Cir.1982). But when the complaint sets forth enough facts to survive a motion to dismiss, but not enough facts to frame the qualified immunity question, should the district court ask the plaintiff to submit a statement of alleged facts further detailing the harm? Should it hold a hearing to determine the undisputed facts? Should it consider discovery materials? Whatever the proper procedure for the district court in such a case, we are certain that in this case, where the complaint adequately describes the harm, we are not to look beyond the allegations.

We therefore confine our inquiry to the question of whether it was clearly established that plaintiffs had a constitutional right to be free from the alleged abusive strip search. Before examining this issue, we will briefly recite the relevant facts.

## II.

Plaintiffs allege the following circumstances of the search. Early in 1981, Framingham correction officials provided the local district attorney's office with information concerning possible drug violations, prostitution, gambling, and staff corruption at Framingham. The district attorney's office undertook an investigation, which involved interviewing informants, reviewing institutional records, and examining telephone records and newspaper articles.

In December 1981, the defendants began planning an extensive search at Framingham. They obtained a search warrant providing that the search would be conducted according to an operational plan, incorporated by reference in the warrant. The plan provided for a search of the entire institution by a combined force of state police troopers and correction officers.

At approximately 3:00 a.m. on January 6, 1982, approximately two hundred state police officers dressed in "riot gear" entered the plaintiffs and other inmates' rooms, awakened them, removed them from their cells, and handcuffed them. The officers refused to allow plaintiffs to put on clothing over their nightwear, and did not permit them to go to the bathroom. Officers searched plaintiffs' rooms for evidence of suspected drug use, gaming, and tax evasion, destroying plaintiffs' property and leaving the rooms in disarray.

While the room searches were being conducted, male officers brought plaintiffs individually to closets, shower stalls, and laundry rooms, where female officers conducted body-cavity searches. The officers did not follow prison instructions that required internal examinations of body cavities to be conducted by medical personnel in a hygienic and respectful manner.[5] None of the female officers were medical personnel, and no medical personnel were present. Several officers touched the plaintiffs' body cavities during the searches, including putting their fingers in the plaintiffs' noses, mouths, anuses, and vaginas. Officers did not change their gloves during a search of an inmate or between searches of different inmates. Indeed, each officer was provided with only one pair of gloves and thus could not have changed their gloves during the search procedure. Provisions were not made for menstruating women; for example, one plaintiff was not permitted to attend to the blood trickling down her leg during the search. The search procedures were visible to male officers who peered through open doors or openings in closed doors. At one point, a female officer threatened to bring a male officer into the room to conduct a strip search when an inmate expressed reluctance at disrobing.

After all searches were completed several hours later, plaintiffs were returned to their cells. Two plaintiffs were then taken to a separate building and questioned by state police detectives. They were not advised of their *Miranda* rights or allowed to consult counsel. Officers also removed five plaintiffs from their cells, and placed them in cold rooms formerly occupied by male inmates. These plaintiffs were returned to their own cells the following afternoon. All plaintiffs were locked in their cells until the evening meal on January 7, with telephone and visitation rights suspended.

## III.

Plaintiffs seek to impose liability on the defendants as supervisory officials respon-

5. The instructions state that "[i]nternal examination of the body orifices, when required, shall be made by medical personnel.... Rectal searches should be conducted in a private area by medical staff in a hygienic manner, and at all times, not done in a demeaning manner." An inmate stated that she had previously been searched by a female nurse in accordance with those prison instructions.

sible for the January 6, 1982 search. Plaintiffs allege that the defendants planned, supervised, and conducted the search, which involved an abusive and unreasonable body-cavity examination, in violation of the plaintiffs' fourth amendment rights.[6] As we have already discussed, the question before us is whether such acts violated rights that were clearly established at the time.

Specifically, we must determine whether it was clearly established that plaintiffs had a fourth amendment right to be free from a body-cavity search as alleged in this case. It was well-established in 1982 that inmates did not forfeit all constitutional protections by virtue of their confinement in prison. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). It was also recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), pretrial detainees at the Metropolitan Correctional Center (MCC) in New York challenged the constitutionality of numerous conditions of their confinement. Relevant for our purposes is the inmates' fourth amendment claim that the institution's practice of conducting vis-

ual body-cavity searches of the detainees following contact visits constituted an unreasonable search of their persons. After "assuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility," *id.* 441 U.S. at 558, 99 S.Ct. at 1884, the Supreme Court analyzed the reasonableness of the search.

The Court stated that the "test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* at 559, 99 S.Ct. at 1844. The MCC had "significant and legitimate security interests", *id.* at 560, 99 S.Ct. at 1885, in preventing inmates from smuggling contraband into the facility by concealing it in body cavities. The Court stated, however, that a body-cavity search "instinctively gives us the most pause." *Id.* at 558, 99 S.Ct. at 1884. Rather than set forth rules for evaluating particular body-cavity searches, the Court phrased its holding narrowly, going no further than necessary to reverse the lower court's ruling. It concluded that "visual body-cavity inspections as contemplated by the MCC rules" could in some cases be conducted on less than probable cause. *Id.* at 560, 99 S.Ct. at 1885.

In analyzing the body-cavity searches, the Court emphasized certain factors. First, the searches were visual; they did not involve touching or physical penetration of the inmates' bodily surfaces. The Court stressed that "[t]he inmate is not touched by security personnel at any time during the *visual* search procedure." *Id.* at 558 n. 39, 99 S.Ct. at 1884 n. 39 (emphasis in original).[7] Second, the

---

6. The search consisted of three aspects: searching the inmates' persons, the inmates' cells, and other areas of the prison, such as the computer room. Although the district court spoke in terms of the search "viewed in its entirety", we are concerned only with the search of the inmates' persons. In light of *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (inmate has no reasonable expectation of privacy in his cell enabling him to invoke fourth

amendment protection), the plaintiffs can no longer claim that their cells or other parts of the prison were unreasonably searched.

7. The Court described the search as follows: "If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected." *Id.* at 558 n. 39, 99 S.Ct. at 1884 n. 39.

searches were conducted on inmates after contact visits that were not closely or constantly monitored, *id.* at 560 n. 40, 99 S.Ct. at 1885 n. 40, and were thus necessary to halt the introduction of contraband into the facility. Third, the Court made clear that it was not providing license for correction officers to conduct strip searches in an abusive manner: "Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion. Such abuse cannot be condoned. The searches must be conducted in a reasonable manner." *Id.* at 560, 99 S.Ct. at 1885 (citation omitted). Thus, the Court envisioned recourse for a prisoner who had been only visually strip searched, even when necessary for prison security purposes, if the search was conducted in an abusive manner.

█ That inmates retained some fourth amendment protection from unreasonable searches of their persons was also the uniform view of the courts of appeals and the local district court[8] at the time of the search in question. *See* Note, *Constitutional Limitations on Body Searches in Prisons,* 82 Col.L.Rev. 1033, 1043 & n. 79 (1982). Most circuits had considered detainees' and inmates' fourth amendment challenges to prison practices, and, although the formulations varied, all courts agreed that some fourth amendment protection was available to inmates as to their persons. *See e.g., Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981) (strip search of detainee unreasonable under *Bell v. Wolfish); Olson v. Klecker,* 642 F.2d 1115, 116–17 (8th Cir.1981) ("Prisoners enjoy at least minimal fourth amendment protection in cell-search situations"); *Hurley v. Ward,* 584 F.2d 609, 611 (2d Cir.1978) (the "gross violation of personal privacy" involved in visual anal/genital searches of inmate, "especially in view of the physical and verbal abuse incident to the procedure", outweighs state's interest in the "prison security measure"); *United States v. Lilly,* 576

F.2d 1240, 1244 (5th Cir.1978) ("searches or seizures conducted on prisoners must be reasonable under all the facts and circumstances in which they are performed"); *Bonner v. Coughlin,* 517 F.2d 1311, 1317 (7th Cir.1975) (Stevens, J.) ("prisoner enjoys the protection of the Fourth Amendment against unreasonable searches, at least to some minimal extent"), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978); *Daughtery v. Harris,* 476 F.2d 292, 294–95 (10th Cir.) (rectal examination of inmates subjected to fourth amendment reasonable analysis), *cert. denied,* 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973). *See also United States v. Chamorro,* 687 F.2d 1, 4 (1st Cir.) ("The courts are generally in accord that what remains of fourth amendment protection behind prison gates is the prohibition of unreasonable searches and seizures.") (citing *Bonner, Lilly, United States v. Savage,* 482 F.2d 1371, 1372 (9th Cir.1973) ("prisoner is entitled to fourth amendment's protection from unreasonable searches and seizures")), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982).

In addition, the local district court had determined that an inmate had stated a cause of action under § 1983 for a fourth amendment violation when he claimed that he was subject to visual rectal body-cavity searches conducted in an abusive fashion. *Arruda v. Berman,* 522 F.Supp. 766, 768 (D.Mass.1981) (Caffrey, C.J.) ("While *Bell v. Wolfish* clearly allows the administration of reasonable body-cavity searches, the plaintiff's allegations, if proven, may be found to be the type of unreasonable body cavity searches which the Supreme Court ruled in *Bell* are forbidden by the Fourth Amendment."). Nor has this view changed since the time of the search in question. This circuit, for example, several months after the search, held that "an inmate retains some residuum of fourth amendment

**8.** We are not limited to Supreme Court pronouncements in assessing whether a legal norm was clearly established. In *Harlow,* the Court spoke of reference to "the opinions of th[e]

[Supreme] Court, of the Courts of Appeals, or of the local District Court." 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32.

protection." *United States v. Chamorro,* 687 F.2d 1, 4 (1st Cir.1982).

Although it was clearly established at the time of the Framingham search that body-cavity searches had to be reasonable, we must still determine whether the particular search alleged in this case was considered unreasonable by the then-prevailing case law. For a legal norm to be clearly established, it does not require "specific judicial articulation." *Blackburn,* 771 F.2d at 570 (quoting *King v. Higgins,* 702 F.2d 18, 20 (1st Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983)).[9] As the Court stated in *Mitchell,* an official is not always "immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances." 105 S.Ct. at 2820 n. 12. But where a "legitimate" or "open" question existed at the time, an official is entitled to qualified immunity. *Id.* at 2820 & n. 12.

In the instant case, we find that the reasonableness of the search complained of was not an open question at the time of the alleged violation. All courts that had considered the issue had recognized "the severe if not gross interference with a person's privacy that occurs when guards conduct a *visual* inspection of body cavities". *Arruda v. Fair,* 710 F.2d 886, 887 (1st Cir.) (emphasis added), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983). *See e.g., Wolfish,* 441 U.S. at 558, 99 S.Ct. at 1884 (body-cavity searches "give[ ] us the most pause"); *Hurley,* 584 F.2d at 611 ("gross violation of personal privacy"); *Lilly,* 576 F.2d at 1246 ("few searches are more intrusive").

The searches to which the plaintiffs were allegedly subject did not involve only the visual inspection of body cavities present in each of the previously cited cases. It is alleged in this case that police officers touched and placed their fingers in the noses, mouths, anuses, and vaginas of the plaintiffs. This distinction is significant and has been noted by courts. *See e.g., Wolfish,* 441 U.S. at 558 n. 39, 99 S.Ct. at 1884 n. 39 (*"visual* search procedure") (emphasis in original); *Blackburn,* 771 F.2d at 565 n. 5 ("Even courts that have upheld body cavity searches of inmates ... have emphasized that those searches included no touching at all") (citations omitted); *Arruda v. Fair,* 710 F.2d 886, 887 (1st Cir.1983) ("visual inspection of body cavities"); *Thorne v. Jones,* 765 F.2d 1270, 1271 n. 1 (5th Cir.1985) ("In a strip search, the naked body of the subject is very thoroughly inspected, but not touched"); *Security and Law Enforcement Employees v. Carey,* 737 F.2d 187, 192 (2d Cir.1984) ("It is important for analytical purposes to note that none of the searches of the correction officers herein involved any touches, probes or other bodily intrusions."); *Bono v. Saxbe,* 527 F.Supp. 1182, 1186 (S.D.Ill.1980) (the "redeeming quality of the search is its visual, non-contact nature"), *aff'd in part and remanded in part,* 620 F.2d 609 (7th Cir. 1980).

Apart from the touching that was claimed to be involved, the body-cavity searches were further aggravated in this case. The searches of the female inmates were conducted in the presence of male officers; police officers, not medical personnel, performed the searches; and each officer was provided with only one pair of gloves for the entire procedure. In reviewing the reasonableness of particular body-cavity searches, courts have stressed that they were conducted in a private area and in a hygienic manner. *See e.g., Thorne,* 765 F.2d at 1271 n. 1 (search conducted by

---

9. As another court has stated:

"[T]o require a prior Supreme Court holding on the particular facts of this case would not only immunize but actually reward the Government for inventing and pursuing ever more egregious conduct. Indeed, there never could be such a ruling from the Court, because *Harlow* would always immunize the

Government actors. Simply put, where it is apparent that less direct, and facially legitimate intrusions on plaintiffs' rights violate the Constitution, it is beyond question that sweeping, intentional intrusions do so as well." *Hobson v. Wilson,* 737 F.2d 1, 29 (D.C. Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

prison personnel of same sex and conducted in private); *Hurley*, 584 F.2d at 610 n. 1 (if body-cavity search is needed, inmate shall be examined by "facility health staff member"); *Lilly*, 576 F.2d at 1247 ("body cavity search was conducted by a female medical officer in the prison clinic in the presence of only the medical officer and a female correctional officer"); *Daughtery*, 476 F.2d at 295 (search "carried out by trained paraprofessional medical assistants in a designated area and under sanitary conditions", and no attempt made by "officials or medical personnel to humiliate or degrade" inmates).

■ In light of the then-prevailing case law from the Supreme Court, the courts of appeals, and the local district court, we find that a body-cavity search of female inmates conducted by police officers, involving touching, conducted in a non-hygienic manner and in the presence of male officers, was a clearly established violation of the inmates' fourth amendment right to be free from an unreasonable search.[10]

### IV.

In a separate brief to this court, defendant-appellant William Shaughnessy raises two additional arguments both related to his claim that he did not cause the alleged fourth amendment violation.[11] First, Shaughnessy claims that the plaintiffs did not raise a genuine issue as to whether he in fact committed the acts complained of, and that we should now review the district court's conclusion to the contrary. We find that we do not have jurisdiction to review that question on this appeal.

■ The fact that we have jurisdiction over a district court order on an interlocutory basis does not permit us to review other claims raised below. *Abney v. United States*, 431 U.S. 651, 663, 97 S.Ct. 2034, 2042, 52 L.Ed.2d 651 (1977). Any additional claim presented to and rejected by the district court must independently satisfy the collateral-order exception to the final-judgment rule in order for us to address it on an interlocutory appeal. *Id.* "Any other rule would encourage [parties] to seek review of, or assert frivolous [appealable] claims in order to bring more serious, but otherwise nonappealable questions to the attention of the courts of appeals [prior to final judgment]." *Id.* 431 U.S. at 663, 97 S.Ct. at 2042. Thus, in order for us to review the denial of Shaughnessy's motion for summary judgment on this interlocutory appeal, Shaughnessy must show that the denial meets the requirements of an interlocutory appeal.

■ The district court's denial of Shaughnessy's motion for summary judgment does not satisfy any of the three requirements for interlocutory appeal set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1941). In *Mitchell*, the Court described *Cohen's* three-part test: to be immediately appealable, the or-

---

10. We think it important to note what this challenge does not involve. Plaintiffs do not claim that the strip searches were unconstitutional because they were conducted without reasonable suspicion. Under that claim, defendants would be entitled to qualified immunity because whether reasonable suspicion was required was an open question in 1982. *See e.g., Thorne*, 765 F.2d at 1277; *Carey*, 737 F.2d at 211.

Accordingly, plaintiffs do not challenge the reasonableness of the defendants' decision to search for contraband, but claim that the manner in which the search was conducted was unreasonable. While in some cases involving a reasonableness determination it may be unfair to charge officials with knowledge of the law in the absence of a prior holding on the particular facts of the case, the plaintiffs' allegations in this case show that "defendant[s'] actions are so

egregious that the result of the balancing test will be a foregone conclusion, even though prior caselaw may not address the specific facts at issue." *Benson v. Allphin*, 786 F.2d 268, 276 & n. 18 (7th Cir.1986).

11. In the defendants' motion for summary judgment, five defendants argued, *inter alia*, that they were not responsible for the creation, review, or approval of the search plan. Plaintiffs rebutted this argument by citing specific examples of each defendant's involvement. The district court implicitly rejected the defendants' argument when it refused to grant summary judgment as to any of the defendants on the fourth amendment claim. Shaughnessy is the only one of the five defendants who raises the issue of personal involvement on this appeal.

der must (1) be effectively unreviewable on appeal from a final judgment; (2) conclusively determine the disputed question; and (3) resolve an important issue completely separate from the merits of the action. *Mitchell*, 105 S.Ct. at 2815.

As to the first requirement, a denial of a claim that discovery has not uncovered facts sufficient to raise a genuine issue as to whether defendant caused the alleged wrong is not "essentially unreviewable". This claim, like a defense based on statute of limitations, collateral estoppel, or lack of jurisdiction, is a defense to liability, which need not be reviewed before the proceedings terminate in order to be reviewed at all. *Id.* A defense to liability is not effectively lost if a case is erroneously permitted to go to trial.

Pretrial motions relating to liability are quite distinct from the qualified immunity claim addressed in *Mitchell.* When a government official asserts a defense of qualified immunity, his argument is that, even assuming the plaintiff's allegations are true, he is immune from suit because the law allegedly violated was not clearly established at the time. Immunity from suit is an entitlement not to stand trial, "rather than a mere defense to liability". *Id.* at 2816. Thus, the entitlement is "effectively lost if a case is erroneously permitted to go to trial." *Id.*

In contrast, Shaughnessy's claim that he did not in fact cause the alleged wrong is not an argument that he is entitled to immunity, but rather is an argument that he is not liable. That claim is not effectively unreviewable. Of course, any dispositive, pretrial motion, if erroneously decided against government officials, would necessarily have the unfortunate effect of requiring them to proceed to trial. But we are not prepared to create, and do not think the Supreme Court would countenance, an approach completely eliminating the final-decision requirement for public officials, granting them the right to immediately appeal any adverse pretrial ruling. *Id.* at 2830 (opinion of Brennan, J., dissenting) ("I hardly think the Court is prepared to hold that a government official suffering an adverse ruling on any [dispositive preliminary issue] would be entitled to an immediate appeal.").

Moreover, the district court's denial of summary judgment for Shaughnessy clearly fails to satisfy *Cohen's* second and third criteria, which an appealable interlocutory decision must satisfy. *Mitchell*, 105 S.Ct. at 2816. The second criterion is that the decision must "conclusively determine the disputed question". *Id.* (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)). In this case, the subsequent course of the proceedings could alter the district court's conclusion that a genuine issue exists as to whether the defendant in fact committed the alleged acts. Either after more discovery or after the presentation of the plaintiff's case at trial, the court may grant Shaughnessy's motion for summary judgment or directed verdict by finding that a genuine issue no longer exists as to his involvement in the alleged wrong. Thus, the court's denial of summary judgment on these grounds does not finally and conclusively determine the defendant's claim.

Shaughnessy's claim also fails to satisfy the third criterion, which is that the "question must involve a 'clai[m] of right separable from, and collateral to, rights asserted in the action'". *Mitchell*, 105 S.Ct. at 2816 (quoting *Cohen*, 337 U.S. at 546, 69 S.Ct. at 1225) (brackets in original). Quite obviously, the defendant's claim that he did not in fact commit the alleged acts cannot be described as "conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Id.* at 2816. Unlike the claim of qualified immunity, this claim requires the appellate court to "consider the correctness of the plaintiff's version of the facts" and "whether the plaintiff's allegations actually state a claim". *Id.* Thus, the denial of Shaughnessy's Rule 56 motion is an interlocutory order from which no appeal is available until the entry of judgment following the trial on the merits. *See, e.g.,* Wright, Miller &

Kane, *Federal Practice and Procedure: Civil 2d* § 2715, at 636 (1983).

■ Shaughnessy's second argument is that the district court erred in denying his claim of qualified immunity because "another officer, standing in [his] shoes and having the same information [he] had, would [not] reasonably have come to the conclusion that by assisting in developing [the search plan], he was thereby violating a constitutional right of the plaintiffs." [12] Although we have difficulty discerning the precise nature of this argument, we believe Shaughnessy is claiming that he is entitled to qualified immunity because he should not reasonably have known that his conduct would be deemed cause-in-fact of the alleged violation. As we shall now discuss, this argument no longer fits within the immunity inquiry.

Prior to *Harlow*, the immunity standard had both an "objective" and a "subjective" aspect. *See Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975) (official not immune if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights [of the plaintiff], or if he took the action with malicious intention to cause a deprivation of constitutional rights...."). The objective aspect itself had three components: was "the constitutional right allegedly infringed by [the official] clearly established at the time of the[ ] challenged conduct"; did the official know, or should he have known, of that right; and did the official know, or should he have known, that his conduct violated the constitutional norm. *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). Shaughnessy's argument is, in effect, the last question under the objective prong, which focuses on the causal link between his conduct and the violation. But the Court in *Harlow* eliminated this question from the immunity inquiry.

In *Harlow*, the Supreme Court narrowed the inquiry to the sole question of whether the statutory or constitutional rights allegedly violated were clearly established. The purpose behind this new formulation was to allow for the resolution of many complaints before discovery or trial. 457 U.S. at 816–18, 102 S.Ct. at 2737–38. The Court eliminated from the immunity standard questions such as causation, which depended upon the facts of the individual case, so that immunity could be granted or denied on the basis of the allegations in the complaint. While *Mitchell* provided that decisions denying qualified immunity could be immediately appealed, it expressly limited the scope of the appeal to *Harlow's* "purely legal" question of "whether the legal norms allegedly violated" were clearly established. *Mitchell*, 105 S.Ct. at 2816 & n. 9.

Whether phrased as an appeal from the district court's finding that genuine issues existed as to causation, or as an appeal from the district court's denial of the immunity claim, Shaughnessy's argument that he did not cause the alleged violation is not properly before us on this *Mitchell* appeal. As the D.C. Circuit stated in *Hobson v. Wilson*, 737 F.2d 1, 29 (D.C.Cir. 1984), "we must consider in this action only whether the right that plaintiffs alleged to have been violated was well-established at the time the alleged acts occurred. We consider irrelevant to this inquiry defendants' assertions that the evidence does not support those allegations; such evidence is properly considered as an element of our inquiry into the sufficiency of the evidence, not qualified immunity."

We acknowledge that it is superficially tempting, in the interests of judicial economy, to address on interlocutory appeal any issue that might be dispositive of a defendant official's freedom from liability, such as his causal connection with the acts charged, a statute of limitations defense, or collateral estoppel. *Mitchell's* deliberately

---

**12.** Shaughnessy also joins the other defendants' argument that they are entitled to qualified immunity because an inmate's right to be free from an unreasonable search was not clearly established in 1982.

narrow focus, however, is amply justified by the implications of a broad-ranging review. Factually based interlocutory appeals from denial of summary judgment typically involve the reading of lengthy depositions, answers to interrogatories, documents, and record material, often filled with ambiguous and unclear statements. Deciding whether there is, or is not, sufficient evidence to warrant placing a factual question before a jury is often excruciatingly difficult. Trial judges often err on the side of submission, for a jury verdict, after all, typically washes out the summary judgment question, turning it into the easier question of the legitimacy of the verdict in light of all the evidence placed before the jury. To require appellate courts to investigate and to answer such questions before trial would, of course, occasionally save a government defendant the onerous burden of unnecessarily standing trial, but it would also interfere with the opportunities of other litigants to obtain justice by significantly slowing down the appellate process. We are not willing to believe that the Supreme Court has told us to undertake on a routine basis this onerous, unwieldy task of reviewing factually based trial court rulings that might otherwise never be presented for review without a clear statement to that effect.

Finally, we note that a defendant such as Shaughnessy, believing that plaintiffs can show no factual link between him and the complained of conduct, is not without a remedy. He can ask the district court for summary judgment; he can ask the jury for a verdict; he can, if necessary, ask for a directed verdict and a judgment n.o.v. Eventually, he can obtain appellate review of any adverse jury verdict. We note that in this case plaintiffs have not specifically stated the connections they intend to prove between the particular conduct complained of and *each* of the defendants they have sued. We believe that it should still be open to defendants to ask the district court to order such a specific statement and to reconsider, in light of that statement and the evidence in the record, the individual defendants' requests for summary judg-

ment. *See Mitchell*, 105 S.Ct. at 2816 (even when "plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.").

*The order of the district court denying defendants qualified immunity as to the alleged fourth amendment violation is affirmed.*

BREYER, Circuit Judge (concurring).

I have joined the majority opinion and write separately only to explain why I do not accept Judge Campbell's solution to the difficult procedural problem that concerns him. The problem is this: what set of facts should an appellate court assume when it hears an interlocutory appeal from a denial of summary judgment in a § 1983 case—an appeal brought by a government official who has claimed "qualified immunity."

The problem is difficult because it poses the following dilemma. On the one hand, the appellate court is tempted to treat the interlocutory appeal as if it were like any other summary judgment appeal, at least in respect to the legal question of what facts to assume. An appellate court will decide an ordinary summary judgment case (typically, a case in which a district court has granted summary judgment) by looking to see which facts have enough record support to persuade a reasonable factfinder. Why then should an appellate court, on this interlocutory appeal, assume a different set of facts that may lack this minimal record support?

On the other hand, the appellate court is aware of the time and effort that it takes to decide whether the record offers sufficient support for a particular finding of fact. Doing so often requires the court to read lengthy depositions, interrogatory answers, and other record material that may be filled with vague or ambiguous statements. This "judicial resource" problem is

one reason why interlocutory appeals are rarely allowed; it also can lead district courts to deny summary judgment motions in complex cases and send them to trial where the jury's verdict may "wash out" any summary judgment issue. Why should an appellate court undertake this factually-related type of review on an interlocutory appeal of a "qualified immunity" question, when that interlocutory appeal seeks basically to answer a different kind of legal question, namely whether the *right* at issue was "clearly established?"

Judge Coffin's opinion, in my view, resolves this dilemma correctly. It takes as the factual predicate for reviewing the "clearly established" question, the same facts that the district court assumed in providing its answer to that question. I do not believe we need always take this approach. In an appropriate case this court may review a district court's factually-based determinations on an interlocutory "qualified immunity" appeal. *See Jimenez Fuentes v. Torres Gaztambide*, 803 F.2d 1 (1st Cir.1986); *De Choudens v. Government Development Bank of Puerto Rico*, 801 F.2d 5 (1st Cir.1986). But the approach is particularly sensible when the district court itself seeks to avoid a difficult summary judgment determination and instead sends the case to trial. In such a case, this approach allows the appellate court to review the legal issue of "immunity" without reviewing the factual elements of the district court's summary judgment determination. It thus avoids lengthy, interlocutory entanglement with complex, factually difficult, record-based issues, while affording interlocutory review in respect to the basic question of immunity—the question that provides the very reason for permitting the special appeal.

As Judge Coffin points out, this approach is consistent with the language of *Mitchell*. That language refers only to two sets of circumstances, in neither of which are the facts (or questions about what facts the record will support) in dispute. It speaks of (1) a district court holding that a complaint alleges violation of a "clearly established" right (followed by de-

fendant's appeal); and (2) a district court's (a) *acceptance of* defendant's version of the facts and (b) its holding that those facts amount to a violation of a "clearly established" right (followed by defendant's appeal). *Mitchell* does not refer to (3) a district court's (a) *refusal to accept* defendant's version of the facts and (b) its holding that plaintiff's allegations amount to a violation of a "clearly established" right (followed by defendant's appeal of *both* (3)(a) *and* (3)(b)). As Judge Coffin also points out, the theory of *Mitchell* that the interlocutory appeal is to consider fairly clear legal issues not requiring elaborate review of potential evidence in the record, also supports this approach.

Finally, a defendant such as Shaughnessy, believing that plaintiffs can show no factual link between him and the complained of conduct, is not without a remedy in respect to this basically factual question. He can ask the district court for summary judgment; he can ask the jury for a verdict; he can, if necessary, ask for a directed verdict and a judgment n.o.v. Eventually, he can obtain appellate review of any adverse jury verdict. Indeed, in this case plaintiffs have not yet specifically stated the connections they intend to prove between the particular conduct complained of and *each* of the defendants they have sued. I believe it should still be open to defendants to ask the district court to order such a specific statement and to reconsider, in light of that statement and the evidence in the record, the individual defendants' requests for summary judgment.

CAMPBELL, Chief Judge (dissenting).

I respectfully dissent from the court's reasoning. Because the law is still being formed following the Supreme Court's allowance of interlocutory appeals about qualified immunity, I feel justified in stating my views separately and at some length.

My colleagues seem to believe that a qualified immunity claim raised prior to trial should be analyzed exclusively in

terms of plaintiffs' allegations in the complaint.[1] They would first ascertain from the complaint, in a general way, the nature of the constitutional violation alleged by plaintiffs. They then would ask if the law was clearly established, at the time defendants acted, that such an alleged violation was, in fact, a violation. The district and appellate court's review would thereafter focus only on that question.

In my view, this analysis would be appropriate in a case where the lower court's ruling on immunity rested on a motion based on the pleadings. But the immunity ruling appealed from here was in the context of a motion for summary judgment, after two years of discovery. We thus have an extensive record showing what the parties can prove as to the actual conduct of each of the defendants. In such a case, I believe *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), contemplates that we look at each defendant's qualified immunity claim in light of the facts of his or her conduct, such conduct to be ascertained under usual summary judgment analysis. *See* Fed.R.Civ.P. 56. This involves deciding each defendant's qualified immunity claim on the basis not of the pleadings but of the "facts" tentatively established from the contents of the depositions, discovery materials, affidavits, etc., read in a light most favorable to the position of the non-movant, *i.e.*, here plaintiffs. If it should be found, after doing so that any defendant is entitled to prevail, as a matter of law, on his qualified immunity claim, that ends the case against him. But if the immunity claim fails as a matter of law, or if its outcome is found to depend on a triable issue of fact, the case proceeds onward to trial or other disposition, and the interlocutory appeal is resolved against the defendant. Thus, the district court should have tested each defendant's *conduct*, as so ascertained, rather than plaintiffs' generalized allegations only, against the qualified immunity defense. The district court's failure to do so here is perhaps excusable because defendants failed to properly present their individual immunity claims, but instead relied upon the overall contention that the law was not established against offensive strip searches in general. But my colleagues do not decide this case on that narrow ground, but rather imply that the analysis used here is to be generally employed.

I do not know on what basis my colleagues can read *Mitchell* as licensing deviation from the normal method by which facts are ascertained on summary judgment. Such norms do not, of course, involve factfinding as such. Summary judgment rests on purely legal assumptions. The non-movants are entitled to the benefit of all favorable factual assumptions. But I know of no precedent for treating a motion for summary judgment (addressed narrowly, to be sure, to the single defense of qualified immunity) as if it were simply a motion for judgment on the pleadings. Nor can a claim of qualified immunity be addressed without close attention to the individual conduct of the defendant. The question is whether, objectively viewed, *such conduct* violates clearly established law—not whether plaintiffs' perhaps inflated allegations in their complaint indicate a violation of established law. Surely if the *Mitchell* Court intended the departure from conventional norms, it would have said so with much greater clarity.

My colleagues follow an unprecedented procedure which frankly I do not grasp. Notwithstanding the existence of extensive discovery materials, and the fact that defendants have raised their immunity claim by way of a summary judgment motion, my colleagues limit their inquiry to allegations in the complaint. They dismiss any other avenue as raising inappropriate factual questions, which they refer to as questions of "causation." They insist that even defendants who have presented unrebutted proof as to their conduct are not entitled to have their immunity determined in light of

1. Judge Breyer, to be sure, would adopt this approach only some of the time but does not indicate how future courts, district and appellate, are to tell when the proper occasion has arisen.

that conduct but must await some later judgment day. Since (incorrectly, I believe) they regard summary judgment analysis as tantamount to making findings of fact, they sternly quote language from *Mitchell* to the effect that we should avoid considering the correctness of plaintiffs' facts. But, of course, summary judgment *never* involves factfinding as such. One merely *assumes* facts most favorable to the non-movant and asks whether, on those assumptions, movant still wins as a matter of law. If there is a dispute over facts relevant to disposition of the motion, the trial must go on. But one must first read the depositions, affidavits, etc., to see if this is so.

I see nothing in *Mitchell* to require or support my brothers' different procedure. The *Mitchell* Court itself clearly did not determine the defendant's qualified immunity claim *in vacuo* only on plaintiff's pleadings and assertions. In *Mitchell*, the Supreme Court asked whether the law was clear that "warrantless wiretaps aimed at gathering intelligence regarding a domestic threat to national security" were illegal at the time the defendant ordered the wiretaps. *Mitchell*, 105 S.Ct. 2818. And yet the factual question as to the Attorney General's motive for issuing such a warrantless wiretap had been in dispute. The Court in a footnote stated:

> Forsyth insists that even if the District Court was incorrect in concluding that warrantless national security wiretaps conducted in 1970–1971 violated clearly established law, Mitchell is not entitled to summary judgment because it has never been found that his actions were in fact motivated by a concern for national security. This submission is untenable. The District Court held a hearing on the purpose of the wiretap and took Mitchell at his word that the wiretap was a national security interception, not a prosecutorial function for which absolute immunity was recognized. The court then concluded that the tap violated the Fourth Amendment and that Mitchell was not immune from liability for this violation under the *Harlow* standard.

Had the court not concluded that the wiretap was indeed a national security wiretap, the qualified immunity question would never have been reached, for the tap would clearly have been illegal under Title III, and qualified immunity hence unavailable. In this light, the District Court's handling of the case precludes any suggestion that the wiretap was either (1) authorized for criminal investigatory purposes, or (2) authorized for some purpose unrelated to national security.

*Id.* at 2820 n. 13. Thus, the Supreme Court's resolution of Mitchell's qualified immunity claim was not based merely on the plaintiff's allegations as my colleagues now believe *Mitchell* requires. Rather, the Court relied upon certain post-complaint factual predicates. One cannot rule meaningfully on qualified immunity in a factual vacuum. Our own cases of *Floyd v. Farrell*, 765 F.2d 1 (1st Cir.1985) and *DeAbadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.1986), and the Court's case of *Malley v. Briggs*, —— U.S. ——, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), make this clear. In *Floyd*, we determined whether, objectively viewed, the officer had grounds for a particular arrest under then existing law. We did not look at the complaint; we looked at the facts so far developed. In *DeAbadia* we followed the same procedure. To be sure, if summary judgment analysis shows that the immunity issue turns on disputed facts, the motion must be denied and the case sent to trial. But that is different from refusing to look at the supporting materials.

In the present case, by focusing only on plaintiffs' generalized hyperbole as to the character of the search and the right violated, the majority simply ignores the conduct of each individual defendant. The error of this approach is highlighted in the case of defendant Shaughnessy, whose uncontroverted statements, in depositions, etc., are that all he did was submit the affidavit in support of a search warrant and work on an operational search plan that was not adopted. He was not at the prison. Plaintiffs produced no contrary evidence as to

Shaughnessy, nor have they ever denied Shaughnessy's assertions after more than two years of discovery. My colleagues, however, say that the only relevant law to examine is whether a supposed violent, overreaching prison search violates the Constitution. Shaughnessy's own conduct is simply irrelevant, they say, at this stage since plaintiffs' complaint alleges, generally, that all defendants were involved in the illegal search. I simply don't understand on what basis this analysis is constructed. This is not the case where, for example, plaintiffs present evidence that Shaughnessy was present at a strip search and abused certain prisoners, whereas Shaughnessy claims that he was not present and only had some marginal, absentee connection with the incident. (In such circumstances, on summary judgment we would accept plaintiffs' version and send the case to trial.) No one disputes Shaughnessy's own version of the facts. Shaughnessy is not raising the defense of "I wasn't involved" or some other "wrong man" defense. He is saying, "I did participate, officially, by doing certain specific things at a preliminary stage, but that conduct did not, objectively viewed, violate the Constitution. If you look at my conduct you'll see I'm entitled to qualified immunity." He is, in other words, raising a genuine immunity defense and he is entitled to have a court rule on that defense prior to trial by examining the caselaw relevant to such conduct. The question is simply whether the law was "clearly established" that doing those limited, preliminary things that are all Shaughnessy did was a violation of a constitutional right.

Under the court's reasoning we would never reach this analysis, however, because

it focuses merely on the alleged constitutional violation in the abstract, *i.e.*, body searches of the worst sort, and not on what the record (viewed in plaintiffs' favor) shows as to each defendant's involvement in various stages of the entire incident. Whether Shaughnessy's limited actions violate clearly established law seems to me to be a significantly different question from that discussed by the majority. As to him, it is not enough to focus the "clearly established law" inquiry on a strip search itself or even, in general, whether supervisors may be held liable; rather, the inquiry must be directed at whether the law forbade what, in essence, he did. The inquiry into each participant's immunity defense is entitled to be framed in light of the conduct actually established, through discovery, taken most favorably to plaintiffs in connection with the motion for summary judgment.[2] The question in each case is, did that conduct (not some generalized collective conduct characterized colorfully in plaintiffs' complaint) violate clearly established law?

I realize that this court's unusual approach to this type of a fact-bound case is in response to its serious concern over a problem seemingly not anticipated in *Mitchell*. The concern is how to avoid delaying plaintiff's case, and wasting an appellate court's time, through lengthy interlocutory reviews of the denials of qualified immunity motions.

We all know that in complex, fact-intensive cases, a good trial judge will often prefer to deny summary judgment motions and proceed to trial. By going to trial, lengthy hair-splitting over the technical sufficiency of the evidence in affidavits and

2. By ignoring defendant's actual conduct, and focusing only on allegations in the complaint, the court reduces the qualified immunity defense to one which takes effect only if the law itself is murky in the broad area within which plaintiff believes defendant's misconduct should fall. Yet a qualified immunity may exist even if the law is fairly clear in the general area of a defendant's alleged transgressions. The question is whether defendant should reasonably have known that what he did violated federal law—not whether the federal law, in a general way, was consistent and clear at the time. A

guard who, under orders, stands by a prison gate while a strip search is conducted within may have a valid qualified immunity defense if he had no reason to believe that his actions violated federal law. This may be so even if the other guards who carried out the search are liable for their own conduct. The question is not the consistency of the law applicable to strip searches generally but how clear the law was in regard to defendant's own conduct. My point is, by disassociating the law from the facts, my colleagues are robbing the immunity defense of much of its potency.

depositions may be avoided. So long as it is the "merits" that are raised in a summary judgment motion, such an election by a trial judge would be non-reviewable. But because the Supreme Court now permits interlocutory appeals relative to immunity claims, a court's denial of summary judgment *on a claim of immunity* entitles the movant to immediate appellate review of that question. If, by raising immunity claims, litigants can force appellate courts to engage in preliminary review of endless depositions in close factual cases on summary judgment, they may be going further than the Supreme Court envisaged when it permitted interlocutory appeals on the subject of limited immunity. What exascerbates the problem, *see Mitchell,* 105 S.Ct. at 2824–26 (Brennan, J., dissenting), is that in many cases limited immunity and "the merits" merge. A court will not be able to decide whether the law was "clearly established" against certain conduct *until it establishes what the conduct was.* In many cases, a defendant will argue, in the alternative, first that his conduct did not violate the constitution and, second that, if it did, a reasonable person would not have known, when he committed the acts, that the law prohibited them.[3]

Suppose, one might ask, an appellate court discovers after reading all the discovery materials in a light favorable to plaintiffs that defendants' establishable conduct really did not violate the Constitution at all? Is this (as distinct from the limited immunity issue) an appropriate matter to consider at all on interlocutory appeal? Arguably, such a circumstance *strengthens,* it does not weaken, the immunity defense, for if the conduct was not unconstitutional, the law against it was *a fortiori* not "clearly established." But this reasoning turns a defense "on the merits" into an immunity defense. Surely the Court in *Mitchell* did not really mean to allow unlimited interlocutory "merits" appeals from the denial of summary judgment in the guise of appeals concerning limited immunity. What should an appellate court do when faced with such an appeal? To simply deny the appeal, after all the work of examining hundreds of pages of discovery transcript, on the ground that the real defense went to the merits of the constitutional claim—and was not really an immunity defense—might seem hair-splitting and unjust.[4] Yet not to make some such distinction would be to sanction interlocutory appeals in most all cases, and eliminate a trial judge's discretion to refuse to resolve the merits of factually close cases upon a motion for summary judgment.

I do not know the full answer to this problem. Perhaps it will become so troublesome that the Supreme Court will reconsider its endorsement in *Mitchell* of interlocutory appeals. Alternatively, as cases are examined, we may devise ways to live with the problem. A radical, but perhaps supportable approach would be to hold that, because of the difficulties involved in dealing with the limited immunity defense in close, fact-intensive cases, where there is an overlap between the immunity defense and the defense of no constitutional violation, we will uphold a district judge's reasonable determination to defer a ruling on qualified immunity until the facts can be developed at trial. Thus the trial judge would be allowed some discretion to postpone resolving the immunity defense by way of summary judgment, if he feels the practicalities of the litigation made this desirable.

It might be feared that the latter approach would carve out a whole new doctrine in conflict with *Harlow* and *Mitchell.* However, the approach is arguably permissible since in *Mitchell* the facts were clear and the Court did not have to reflect on the practical burdens summary judgment pro-

---

3. Here, for example, a defendant might argue that (1) his conduct at the prison in respect to the strip searches did not violate anyone's constitutional rights, and (2) even if it did, it was in a gray area of the law, thus entitling him to qualified immunity, as he could not have known his conduct violated the law.

4. See this circuit's decision in *Floyd v. Farrell,* 765 F.2d 1 (1st Cir.1985), a case in which we essentially reviewed the merits of the summary judgment motion in the course of deciding the issue of qualified immunity.

cedure might impose upon courts where an interlocutory appeal is available to the losing party. It may well be that an advance determination of qualified immunity was never meant to be required in difficult factbound cases where a defendant's conduct is not easily discernible on summary judgment. In such cases (regardless whether summary judgment, technically, can be justified) it may be appropriate to let the case go to trial. Conversely, in factually straight forward cases, like the *Mitchell* case where the defendant's conduct was not in dispute, or in factually simple cases where summary judgment procedures are easily managed, the essentially legal question—whether it was clearly established that the conduct amounted to a constitutional violation—can be appropriately submitted as an interlocutory appeal.

Whether or not the above approach, or something similar is adopted, I respectfully suggest that my colleagues' approaches are incorrect and, worse, will be a source of considerable confusion, since I cannot discern what working principles underlie them. Moreover, it seems to me they overrule *sub silentio* this circuit's precedent in cases like *Floyd v. Farrell* and *DeAbadia,* which did not follow the present analysis.

I therefore dissent.