**Ronald UNWIN, Plaintiff, Appellee,**

v.

**Police Officer Robert CAMPBELL, et al., Defendants, Appellees.**

**State Trooper Mark Furlone and State Trooper John Ellsworth, Defendants, Appellants.**

**Ronald UNWIN, Plaintiff, Appellee,**

v.

**Police Officer Robert CAMPBELL, et al., Defendants, Appellants.**

**Nos. 88–1116, 88–1117.**

United States Court of Appeals, First Circuit.

Heard June 8, 1988.

Decided Dec. 9, 1988.

Larry M. Smukler, Sr. Asst. Atty. Gen., Civil Bureau, with whom Stephen E. Merrill, Atty. Gen., Concord, N.H., was on brief, for appellants State Trooper Mark Furlone and State Trooper John Ellsworth.

Robert A. Stein and Shaheen, Cappiello, Stein & Gordon, Concord, N.H., on brief, for Police Officer Robert Campbell, et al.

John G. Vanacore with whom Leahy, Vanacore, Nielsen & Trombly, Concord, N.H., was on brief, for Ronald Unwin.

* Of the District of Puerto Rico, sitting by designation.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and ACOSTA,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This is an interlocutory appeal from the district court's denial of defendants' motions for summary judgment on grounds of qualified immunity. Defendants are state and local police officers who claim immunity from damages in this prison inmate's action against them brought under 42 U.S. C. § 1983 (1982). Notwithstanding the limits upon our appellate jurisdiction in an appeal of this nature, we hold that we may address the issues raised by defendants, and we affirm in part and reverse in part.

## I. FACTS AND PRIOR PROCEEDINGS

Taken in the light most favorable to plaintiff, the facts appearing from the summary judgment materials are as follows. Late in the evening of December 31, 1983, prison officials at the Merrimack County House of Corrections (the "prison"), located in Boscawen, New Hampshire, telephoned police agencies in the area for immediate assistance. About a dozen officers from several agencies responded, arriving at the prison around 10:00 p.m. to 11:00 p.m. Among the responding officers were the six defendants-appellants (referred to collectively as "defendants" or "appellants"): Troopers Mark Furlone and John Ellsworth of the New Hampshire State Police, Officers Robert Campbell, James Curren, and Robert Terhune of the Franklin, New Hampshire, Police Department, and Officer Mark Sambatero of the Boscawen, New Hampshire, Police Department. Defendants and other responding officers then assembled outside the dayroom of the prison, where a dozen inmates had collected, awaiting orders from prison officials to enter the dayroom and place the inmates in their cells.

All the law enforcement officers had previously surrendered their firearms at the prison entrance. Officers Campbell and Curren brought their nightsticks with them

when they entered the dayroom. The other defendants did not.

Plaintiff Ronald Unwin was a prison inmate. He had spent most of the day watching television and playing cards in the dayroom. Unwin went to the prison gym in the early evening. After this, he returned to the dayroom where he stood watching inmates play cards. Ronald Ballam, an inmate who had earlier been ordered to stay in his cell, came into the dayroom, picked up a chair, and threw it. Ballam was drunk. Another inmate, in an attempt to subdue Ballam, began wrestling with him. Suddenly, while Unwin was watching this fight, defendants and other law enforcement officials rushed into the dayroom. Before Unwin could turn around, he was struck from behind by something hard and fell to the floor. He was held with his face to the floor and struck repeatedly with nightsticks and fists. Unwin was then handcuffed and forcibly carried to a cell. He was forced into a corner of the cell near a toilet. Unwin struggled to get out of the corner. He was struck again, possibly more than once. After his handcuffs were removed, Unwin tried to punch one of the officials in his cell because he was "extremely angry." He is not sure if this punch made contact. Unwin was then slammed against the wall, placed face-up on the bed in the cell, and punched in the face. The officials retreated from the cell and locked the cell door. Unwin, upset by these events, kicked the cell door, yelled, and made obscene gestures at the officials. He was removed from the cell and placed in a padded cell. As a result of the events of this night, Unwin suffered severe contusions to the kidney, and various bruises and lacerations about his body and face.

Unwin subsequently brought this action seeking damages pursuant to 42 U.S.C. § 1983 alleging that defendants had subjected him to cruel and unusual punishment in violation of the Eighth Amendment on the night of December 31, 1983.[1] As defendants, he named not only appellants but also the City of Franklin, the Town of Canterbury, Chief Harold Heath of Canterbury, the State of New Hampshire, State Trooper David Kelley, the Town of Webster, Chief Aime Roy and Officer Adam Roy of Webster, and the Town of Boscawen. After various motions to dismiss and for summary judgment, the district court dismissed the action against all except for appellants: Troopers Furlone and Ellsworth and Officers Campbell, Curren, Terhune, and Sambatero.

After a year of discovery, Troopers Furlone and Ellsworth and Officers Campbell and Terhune renewed their previous motions for summary judgment. Officers Curren and Sambatero also moved for summary judgment at that time. Defendants asserted that the undisputed facts gathered through discovery showed that they had not violated Unwin's Eighth Amendment rights and that, in the alternative, they were entitled to qualified immunity. The district court denied both the state troopers' motion and the local police officers' motion. The district court found that there was a genuine issue of material fact regarding Unwin's Eighth Amendment claim and it denied that appellants were entitled to qualified immunity.

Appellants then appealed from the district court's orders denying them qualified immunity. Their main arguments are that the undisputed facts gathered through discovery show that they could not have violated clearly established law because they had no contact, or only minimal contact, with Unwin, or that any contact with him was no more than the result of their good faith efforts to quell a prison disturbance. Because, appellants say, the evidence gathered through discovery shows no genuine issue of material fact regarding their claims of qualified immunity, the district

---

**1.** Although Unwin's complaint also asserts claims based on the Fourth, Fifth, and Fourteenth Amendments, Unwin and the district court have treated the complaint as solely an Eighth Amendment claim. *See Whitley v. Alb-* *ers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (due process clause affords convicted prisoner no greater protection than does the cruel and unusual punishment clause).

court erred in denying summary judgment in their favor.

■ An initial difficulty with appellants' argument is that, procedurally, it runs counter to this court's ruling in *Bonitz v. Fair*, 804 F.2d 164 (1st Cir.1986). If that decision still stands notwithstanding recent Supreme Court precedent, *see infra*, this court would be limited, in an interlocutory appeal from the denial of qualified immunity, to consideration of just those facts set out in the complaint. *Id.*

Both plaintiff and defendants ignored *Bonitz* in their briefs, but, at our request, they submitted supplemental memoranda on the subject after oral argument. Appellants now contend that, even under *Bonitz*, we should reverse the district court's denial of qualified immunity because the allegations in Unwin's complaint do not allege facts showing that defendants violated clearly established law. Defendants alternatively urge that—if we cannot resolve the qualified immunity question in their favor solely from the complaint—we should overrule *Bonitz* in light of *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and consider the undisputed facts gathered through discovery. If this is done, they say, their right to immunity will be apparent.

If our inquiry were to focus only on the allegations in Unwin's complaint, we would conclude—contrary to defendants' view— that defendants had violated clearly established law and thus were not qualifiedly immune. However, we hold that the restriction in *Bonitz v. Fair*, 804 F.2d 164, is no longer tenable in light of the Supreme Court's decision in *Anderson v. Creighton*, 107 S.Ct. 3034. Under *Anderson*, we have jurisdiction in an interlocutory appeal from the denial of a summary judgment motion made on grounds of qualified immunity, to consider all the materials that were properly before the lower court, including depositions, in connection with such motion. The question before us will be whether, in light of those materials, the district court erred in finding a genuine issue of material fact as to defendants' entitlement to qualified immunity. After considering the record

here, we conclude that defendants Furlone and Campbell should have been granted summary judgment on account of qualified immunity by the lower court, but that as to Ellsworth, Curren, Terhune, and Sambatero there remains a genuine issue of material fact concerning their entitlement to qualified immunity.

## II. APPLICABLE LEGAL STANDARDS

As a general rule, government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). A court must look to the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," to determine whether the doctrine of qualified immunity applies. *Id.*

This case involves the Eighth Amendment prohibition against cruel and unusual punishment. The Supreme Court has applied this prohibition to prison conditions: prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed. 2d 59 (1981). Mere negligence on the part of a public official does not suffice to make out a claim of cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 105– 06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). However, a public official whose "deliberate indifference" allows a prisoner to be injured may violate the Eighth Amendment in certain situations. *Id.* at 104, 97 S.Ct. at 291 ("deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.' "). *See also Layne v. Vinzant*, 657 F.2d 468 (1st Cir.1981); *Ferranti v. Moran*, 618 F.2d 888 (1st Cir.1980).

These standards have been tailored to situations where guards have used physical

force against prisoners. By December 31, 1983, when the incident at issue occurred, it was clearly established "that the unjustified striking, beating, or infliction of bodily harm upon a prisoner gives rise to liability under 42 U.S.C. § 1983 on the part of one who, acting under color of state law, engages in such conduct without just cause." *King v. Blankenship*, 636 F.2d 70, 72 (4th Cir.1980) (collecting cases). *See also Sampley v. Ruettgers*, 704 F.2d 491 (10th Cir.1983); *Hoptowit v. Ray*, 682 F.2d 1237, 1250–51 (9th Cir.1982); *Ridley v. Leavitt*, 631 F.2d 358 (4th Cir.1980); *Stringer v. Rowe*, 616 F.2d 993 (7th Cir.1980). *See generally* S. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 3.07, at 137 (2d ed. 1986).

A finding of liability based on unjustified and excessive use of force against a prisoner is a fact-intensive matter. As Judge Friendly explained in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973),

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

In *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986), the Supreme Court adopted Judge Friendly's last enumerated factor as the correct standard to apply when officials are confronted with a prison disturbance. The plaintiff in *Whitley* had been shot by a prison guard when prison authorities acted to quell a prison riot in which a guard had been taken hostage, even though the plaintiff had played no part in causing the riot. The Supreme Court, emphasizing the context of plaintiff's injuries, held that the deliberate indifference rationale was inappropriate in this case. Rather,

> Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 320–21, 106 S.Ct. at 1084–85 (quoting *Johnson*, 481 F.2d at 1033). The Court explained that courts should accord "wide-ranging deference" to prison officials when they respond to "an actual confrontation with riotous inmates" or when they use "prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." *Whitley*, 475 U.S. at 321–22, 106 S.Ct. at 1085–86.

### III. EXAMINING THE ALLEGATIONS IN UNWIN'S COMPLAINT

In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court held that the courts of appeals have jurisdiction to review a district court's denial of qualified immunity on an interlocutory basis. In *Bonitz v. Fair*, 804 F.2d 164, this court held that this jurisdiction was limited to scrutinizing the allegations in the complaint to determine whether the acts as alleged therein, if proven, violated clearly established law at the time of the alleged incident. Appellants first argue that they are entitled to qualified immunity on the basis of the allegations in Unwin's complaint, thus making it unnecessary to examine facts developed through discovery and to decide whether *Bonitz*, which would preclude such an examination, is still valid law after *Anderson v. Creighton*, 107 S.Ct. 3034. They point out that Unwin has not alleged facts which show that defendants maliciously and sadistically attacked him for the very purpose of causing harm. According to defendants, they cannot be held liable because the facts alleged in the complaint show that Unwin's injuries were merely the result of their

good faith effort to quell a disturbance and return inmates to their cells; thus, they did not violate clearly established law and are entitled to qualified immunity.

We cannot accept this argument because the disturbance charged by Unwin was not necessarily one that would make the *Whitley* standard applicable. 475 U.S. at 320–21, 106 S.Ct. at 1084–85. To be sure, paragraph 11 of the complaint alleged that, "Due to a previous disturbance that day ... law enforcement officials ... were called to help assist in quelling any potential disturbance." But the "previous disturbance" may have subsided by the time the law enforcement officials arrived at the prison, and the vague reference to "any potential disturbance" does not necessarily establish that an actual disturbance was then in progress. In addition, while paragraph 14 of the complaint refers to an inmate's attempt to subdue a boisterous inmate that led to a "struggle" between the two, the complaint goes on to allege that the "remaining four to six inmates were not at all involved in any sort of violent or disruptive activity." We are unable to infer from these contradictory and vague allegations a prison disturbance of a magnitude to justify defendants' alleged conduct merely because it fell short of being malicious and sadistic, much less "a disturbance, such as occurred in [*Whitley*], that indisputably poses significant risks to the safety of inmates and prison staff...." *Whitley*, 475 U.S. at 320, 106 S.Ct. at 1084.[2] Thus, to state an Eighth Amendment claim Unwin did not have to allege that defendants had acted maliciously and sadistically for the very purpose of causing harm. *See Wyatt v. Delaney*, 818 F.2d 21, 23 (8th Cir.1987) (in cases not involving matters of institutional security, an Eighth Amendment violation may be established upon a showing less than that force was applied maliciously and sadistically for the very purpose of causing harm).

Unwin did allege facts indicating that some one or more of the defendants had seriously injured him when they unjustifiably struck him several times while Unwin was innocently standing in the dayroom observing an isolated struggle between two inmates. These allegations, which we would have to take as true for purposes of *Bonitz* analysis, would tend to show that defendants had violated clearly established law and thus were not entitled to qualified immunity. Thus we reject the argument that, under *Bonitz* analysis, appellants should have been granted qualified immunity.

## IV. CONSIDERING FACTS GATHERED THROUGH DISCOVERY

Defendants argue that if we find that they are not entitled to qualified immunity on the basis of the allegations in the complaint, they are nonetheless entitled to immunity because the undisputed facts gathered through discovery regarding their conduct show that they violated no clearly established law. While *Bonitz*, 804 F.2d 164, would preclude us from considering this argument, defendants maintain that *Bonitz* is no longer valid law after *Anderson v. Creighton*, 107 S.Ct. 3034.

### A. *Appellate Jurisdiction*

As already stated, this court held in *Bonitz*, 804 F.2d 164, that its jurisdiction in an interlocutory appeal of a denial of qualified immunity was limited to scrutinizing the allegations in the complaint to determine whether the alleged acts, if proven, violated clearly established law at the time of the alleged incident. *See also Juarbe-Anqueira v. Arias*, 831 F.2d 11 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988); *Roure v. Hernandez Colon*, 824 F.2d 139 (1st Cir.1987); *Cheveras Pacheco v. Rivera Gonzalez*, 809 F.2d 125 (1st Cir.1987). *But see Emery v. Holmes*, 824 F.2d 143, 145 (1st Cir.1987).

---

**2.** Defendants argue that *Bonitz* allows us to examine facts beyond those contained in the pleadings in order to flesh out the alleged harm when the complaint does not adequately do so. *Bonitz*, 804 F.2d at 168 n. 4. Defendants assert that we should do so here because the discovery materials indisputably show the existence of a genuine disturbance on the night in question. We must reject this argument, however, because, as we find below, at pages 135–136, *infra*, there is a genuine issue of fact regarding the existence of such a disturbance.

In "setting a narrow boundary on interlocutory review of a defendant's entitlement to immunity," the *Bonitz* court characterized the qualified immunity inquiry as only focusing on the *alleged* harm suffered by plaintiff. The court refused to permit any inquiry into whether a defendant's actual conduct, as established by undisputed facts developed during discovery or through affidavits, violated clearly established law. *Bonitz*, 804 F.2d at 167. Consequently, "since in our view immunity depends only upon the clarity of the right allegedly violated, the only 'facts' we need to know are those that constitute the harm alleged by the plaintiff." *Id.* at 168.[3] This characterization of the qualified immunity question was based on an interpretation of *Mitchell*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411, and *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Bonitz*, 804 F.2d at 166–68, 175. As the court wrote, "the critical point for us is that *Mitchell* envisions the *interlocutory* appeal of qualified immunity as a straightforward matter of assessing the law and not as a procedure for sorting out facts— even for the purpose of determining whether they are undisputed." *Id.* at 168.

Hence, in *Bonitz* itself, the panel refused to consider a defendant's well documented claim that the undisputed facts regarding his *actual* conduct showed that he could have violated no clearly established law. That contention, no matter how correct, was considered to be outside the scope of the qualified immunity inquiry. The court felt it did not have jurisdiction in an interlocutory appeal to consider what it perceived was simply a question of "causation" going to the "merits." *Id.* at 167, 173–75.

■■■ Soon after *Bonitz*, the Supreme Court's decision in *Anderson v. Creighton*, 107 S.Ct. 3034, came down. We now conclude that *Bonitz*'s narrow definition of the scope of the qualified immunity inquiry must be set aside as inconsistent with the Court's analysis in *Anderson.* In *Anderson*, the Supreme Court made it clear, contrary to *Bonitz*, that a public official's undisputed conduct, as revealed through discovery materials, is relevant. Public officials must be able to

> "anticipate when their *conduct* may give rise to liability for damages." *Davis*, 468 U.S., at 195.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right.

*Anderson*, 107 S.Ct. at 3039 (emphasis added). Thus, it is insufficient to confine the qualified immunity question to the "general right [a public official is] alleged to have violated." *Id.* Under *Anderson*, the proper inquiry must take into account how this general right applies to the particular facts, including a public official's actual conduct. While emphasizing that "qualified immunity questions should be resolved at the earliest possible stage of litigation," the Court stated in *Anderson* that "discovery may be necessary before [defendant's] motion for summary judgment on qualified immunity grounds can be resolved," 107 S.Ct. at 3042 n. 6, given the "fact-specific" nature of the question. *Id.* at 3040. In the same footnote 6, the Court in *Anderson* cited to page 526 of *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815 (citations omitted), a page which contains the following highly significant sentence:

> Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.

---

3. *Bonitz* recognized that the allegations in a complaint might not always adequately flesh out the alleged harm to allow a court to decide the qualified immunity question, and suggested that in such a situation a court could look to materials outside the complaint. *Bonitz*, 804 F.2d at 168 n. 4. *See Nunez v. Izquierdo–Mora*, 834 F.2d 19, 22 (1st Cir.1987) (examining undisputed record material not contained in the complaint).

Given the Court's opinion in *Anderson*, we find *Bonitz v. Fair*, 804 F.2d 164, no longer supportable, and we overrule *Bonitz* to the extent that it limits the qualified immunity inquiry to a narrow examination of the harm asserted in the allegations of the complaint even where both parties have had a sufficient opportunity to engage in discovery.[4] *Anderson* plainly invalidates *Bonitz*'s refusal to go beyond the allegations in the complaint to consider, upon a proper summary judgment motion made after discovery has taken place,[5] whether there is a genuine issue of material fact regarding a defendant's immunity claim.

To be sure, *Anderson* did not involve the precise issue presented in *Bonitz*—whether a court of appeals has jurisdiction to review facts not contained in the allegations of the complaint in an *interlocutory* review of a denial of qualified immunity.[6] But it would make no sense to hold that while a district court must look beyond the complaint, the court of appeals may not. After *Anderson*, a district court is required to examine whether facts gathered through discovery (including facts concerning a defendant's conduct) create a genuine issue of fact regarding the issue of qualified immunity. A court of appeals, on interlocutory review of such a lower court decision, cannot confine itself to just the allegations in the complaint. To apply *Bonitz*, with such a result, would be tantamount to a stubborn refusal to apply anything but the

most literal aspect of the *Anderson* Court's holding. We would, moreover, be ignoring the Supreme Court's heavy emphasis on sparing the qualifiedly immune defendant the burden of standing trial. *Mitchell*, 472 U.S. at 525, 105 S.Ct. at 2815; *Harlow*, 457 U.S. at 816, 102 S.Ct. at 2737. *See also Emery*, 824 F.2d at 145. As defendants state in their supplemental brief, "the qualified immunity right not to stand trial is just as effectively lost if an appellate court does not entertain an appeal of a legally erroneous denial of summary judgment as it is if the district court declines to rule itself on the summary judgment motion."

We thus conclude that we have jurisdiction to review a district court's denial of qualified immunity on grounds that a genuine issue of material fact exists as to the factual predicate of a qualified immunity claim. In such a review, we must examine the discovered facts regarding defendants' conduct relevant to the immunity claim and, applying normal summary judgment principles, determine whether a genuine issue does or does not exist concerning qualified immunity. In so holding, we join the other circuits that have considered the question. *Turner v. Damon*, 848 F.2d 440, 443–44 (4th Cir.1988); *DeVargas v. Mason & Hanger–Silas Mason Co.*, 844 F.2d 714, 718–19 (10th Cir.1988); *Green v. Carlson*, 826 F.2d 647, 650–52 (7th Cir.1987); *Trapnell v. Ralston*, 819 F.2d 182, 184 n. 1 (8th

---

4. Under *Anderson*'s rubric, *Bonitz*'s approach would allow "*Harlow* [and its standard of objective legal reasonableness to] be transformed from a guarantee of immunity into a rule of pleading." *Anderson*, 107 S.Ct. at 3039.

5. The present appeal, of course, involves a motion for summary judgment on grounds of qualified immunity made after a year of discovery during which ample opportunity was afforded *to plaintiff to develop his case. A defendant is* entitled to have his claim for qualified immunity resolved initially on the pleadings alone if his right to immunity is manifest from the pleadings. *See Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815; *Harlow*, 457 U.S. at 817–19, 102 S.Ct. at 2737–38. But where immunity cannot be established on the pleadings, and defendant's qualified immunity claim takes the form of a full-blown motion for summary judgment, there must be adequate opportunity before the court rules for the parties to engage in discovery or

otherwise to generate the appropriate supporting materials. *See Anderson*, 107 S.Ct. at 3042 n. 6; *DeVargas v. Mason & Hanger–Silas Mason Co.*, 844 F.2d 714, 718–19 & n. 2 (10th Cir.1988). We add, however, that, where possible, "such discovery should be tailored specifically to the question of [defendant's] qualified immunity." *Anderson*, 107 S.Ct. at 3042 n. 6. We also caution that regardless of the number of immunity motions made at various stages of a case in the district court, only one interlocutory appeal to this court will normally be allowed. *See Feliciano–Angulo v. Rivera–Cruz*, 858 F.2d 40, 48 n. 8 (1st Cir.1988).

6. The court of appeals in *Anderson* was reviewing a final judgment entered by the district court after it had granted defendant summary judgment on the grounds that defendant's warrantless search of plaintiffs' home was lawful under the Fourth Amendment. *Anderson*, 107 S.Ct. at 3037–38.

Cir.1987); *Myers v. Morris,* 810 F.2d 1437, 1458–59 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *White v. Pierce County,* 797 F.2d 812, 814–15 (9th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); *Kraus v. County of Pierce,* 793 F.2d 1105, 1108 (9th Cir.1986); *Jasinski v. Adams,* 781 F.2d 843, 846 (11th Cir.1986). We also resolve an inconsistency in our own circuit. *Compare Roure,* 824 F.2d 139 (following *Bonitz* in refusing to consider whether there is a genuine issue of material fact regarding qualified immunity claim) *with Emery,* 824 F.2d 143 (citing *Anderson* and deciding whether there is such a genuine issue of material fact).

### B. *Summary Judgment Analysis*

Finding that we have jurisdiction to do so, we now address the question of whether, reading the pretrial record in the light most favorable to Unwin, a genuine issue of material fact exists as to whether defendants' conduct violated Unwin's clearly established rights.[7]

### 1. *Defendants Furlone and Campbell*

■ We find that the undisputed facts show that defendants Campbell and Furlone are entitled to qualified immunity. As to Campbell, there is no evidence at all in the record showing that he had any contact with Unwin. While Campbell entered the dayroom and escorted several inmates to

their cells, his only involvement with Unwin occurred when he observed Unwin kicking his cell door after the door had been secured. Campbell had no physical contact with Unwin whatsoever. Trooper Furlone likewise had no physical contact with Unwin. Furlone stated in an affidavit that he "went to assist at Inmate Unwin's cell but stayed outside because further assistance was not required." Officer Terhune stated in his deposition that, while several officers were struggling with Unwin in the cell, Furlone stepped into the cell and told Terhune to leave the cell because it was overcrowded. But Terhune also stated that, while Furlone stepped into the cell, Furlone was not involved in the struggle with Unwin.[8] Other than this, and a brief glance at Unwin after Unwin had been locked in a padded cell, Furlone had no involvement with Unwin that night. There was no evidence to the contrary.

Because the undisputed facts show that Furlone and Campbell did not cause Unwin's injuries, their conduct did not violate clearly established law and thus they are entitled to qualified immunity.[9] *See Kostka v. Hogg,* 560 F.2d 37, 40 (1st Cir.1977) (individual who had no personal role in deprivation of constitutional rights cannot be held liable in section 1983 action); *Duncan v. Duckworth,* 644 F.2d 653, 655 (7th Cir.1981) (same). Unwin had nearly a year to uncover evidence through discovery to connect Furlone's and Campbell's actions

---

**7.** The district court appears to have based its denial of defendants' qualified immunity claims on the allegations in Unwin's complaint. The district court considered the discovery materials in denying defendants' motion for summary judgment regarding the "merits"—whether defendants had violated current constitutional standards. While the district court should normally undertake the standard summary judgment analysis when a qualified immunity claim is supported by discovery materials and the plaintiff has had sufficient opportunity for discovery (unless the public official can be granted immunity on the pleadings alone), in this case the district court essentially did this because the merits question merges with defendants' qualified immunity argument.

**8.** Piere Planchet, another officer present that night, stated that he saw a state trooper (he could not identify the trooper) strike Unwin in

his cell. However, the record shows that Trooper Ellsworth was the only trooper who could have struck plaintiff. Plaintiff's attorney conceded this point at oral argument.

**9.** This is a case where it has been shown not only that these two defendants did not violate law *clearly established* at the time of the event, but did not violate the law *at all,* then or now. It might be argued that defendants' right to prevail "on the merits" forecloses their right to prevail on qualified immunity, thus barring the present interlocutory appeal. However, "the merits" and the issue of qualified immunity are inexorably intertwined in this instance. To afford the two defendants immunity only if the law had been a little less favorable to them would seem ridiculous. *Cf. Emery,* 824 F.2d at 147 (considering, as first part of qualified immunity analysis, whether plaintiff's constitutional rights were violated).

to his injuries. But he has presented nothing to suggest such a connection. Summary judgment is appropriate in such circumstances. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Daury v. Smith*, 842 F.2d 9 (1st Cir.1988).

▉ Unwin contends that the doctrine of *res ipsa loquitur* applies to this case and argues that defendants' liability may be presumed until the defendants identify who was directly responsible. To support his argument that the burden of proof regarding causation should be shifted to defendants, Unwin cites only two tort cases, *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), and *Ybarra v. Spanguard*, 25 Cal.2d 486, 154 P.2d 687 (1944). *Summers* held two hunters jointly liable for plaintiff's injuries caused by being hit by gunshot negligently fired by both hunters where the defendants were unable to produce testimony as to which one of them had actually inflicted the plaintiff's injuries. *Summers* is clearly inapposite here because all the evidence shows that Furlone and Campbell, unlike *both* the defendants in *Summers*, did not act wrongly. This distinguishes this case from *Summers* which dealt with "one special type of situation in which the usual rule that the burden of proof as to causation is on the plaintiff has been relaxed. It may be called that of clearly established double fault and alternative liability." W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 41, at 270–71 (5th ed. 1984) (hereinafter "Prosser and Keeton on Torts"). *See Burton v. Waller*, 502 F.2d 1261, 1282–84 (5th Cir.1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1356, 43 L.Ed.2d 442 (1975). There was no "clearly established double fault" in this case.

We also reject Unwin's argument based on *Ybarra*. In *Ybarra*, an unconscious patient undergoing an operation suffered a traumatic injury, and *res ipsa loquitur* was applied against all of the doctors and hospital employees connected with the operation, although it seemed quite clear that not all of them could have been responsible. "The basis of the decision appears quite definitely to have been the special responsibility for the plaintiff's safety undertaken by everyone concerned." *Prosser and Keeton on Torts* § 39, at 252–53. We decline to follow *Ybarra*'s approach in this case for the same reasons the Seventh Circuit gave in *Wellman v. Faulkner*, 715 F.2d 269, 276 (7th Cir.1983) (civil rights action challenging prison conditions), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984):

> Unlike *Ybarra*, the defendants here are not the individuals who were immediately responsible for plaintiffs' care. Also, unlike *Ybarra* in which the standard of liability was mere negligence, in the instant case negligence would not be enough, *Estelle*, 429 U.S. at 106 [97 S.Ct. at 292].... Finally, although prisoners are to some extent handicapped in identifying who precisely is responsible for their mistreatment, we cannot say that they are so limited in their access to information that the burden of explanation should be shifted to defendants.

We thus refuse to apply the doctrine of *res ipsa loquitur* to this case and to shift the burden of proof regarding causation to the defendants.

We accordingly find that defendants Furlone and Campbell are entitled to qualified immunity and should have been granted summary judgment on this basis.

### 2. *Defendants Ellsworth, Curren, Terhune and Sambatero*

While Unwin has not been able to personally identify the law enforcement officers who had contact with him on the night in question, the remaining four defendants, Trooper Ellsworth and Officers Curren, Terhune, and Sambatero, all admit having physical contact with Unwin during the time Unwin was repeatedly beaten. The depositions of the various law enforcement officers indicate that Trooper Ellsworth was the first of appellants to have contact with Unwin that night. After escorting several other inmates to their cells, Trooper Ellsworth saw three to four officers struggling with Unwin in the dayroom. Ellsworth then assisted these officers in their

struggle with Unwin. According to Unwin's answers to interrogatories, it was sometime during this struggle in the dayroom that Unwin had been hit from behind, fell to the ground where he was held face down, and struck on the side of his face with fists and nightsticks. Unwin was handcuffed at some point during the struggle in the dayroom. Ellsworth, grabbing Unwin by his arm, moved Unwin to his cell with the help of Officers Sambatero and Terhune, who had come to assist Ellsworth at some point. In his answers to interrogatories, Unwin stated that he was carried to his cell where he was forced into the corner of his cell and repeatedly beaten. Sometime after entering the cell, Trooper Ellsworth and Officer Sambatero, with the help of Officer Terhune, placed Unwin on the bed in the cell. Several other officers, including Officer Curren and Piere Planchet[10] observed the struggle with Unwin outside his cell. Defendants assert that Unwin struggled violently with them.

After Unwin appeared to have calmed down and the handcuffs were removed, Trooper Ellsworth asserts that he left the cell. While Officers Terhune and Sambatero were leaving the cell, Unwin sprang off the bed and took a swing at one of the officers, possibly landing a punch on Officer Sambatero's face. Sambatero threw Unwin against the wall of the cell. Several officers rushed into the cell at that point, including Officer Curren. Curren testified that he then struck Unwin in the face in order to subdue him. The officers then locked the cell door as they left the cell.

Piere Planchet tells a somewhat different story. According to Planchet, he was outside Unwin's cell when he noticed a state trooper struggling with Unwin while Unwin was crouched on his knees with handcuffs on. While he cannot identify the state trooper, Planchet is certain that it was a state trooper because of the green state police uniform worn by the person. Planchet entered the cell to assist the trooper. While another officer may have been in the cell at first, this officer left

when Planchet entered the cell. Planchet pressed his knee against Unwin and pushed him against the toilet in the cell while the trooper removed Unwin's handcuffs. The trooper (not one of the local police officers) then punched Unwin in order to daze him. Planchet and the trooper then left the cell and secured the door.

■ Before it is possible to evaluate the conduct of each of these four defendants to determine whether they transgressed clearly established Eighth Amendment standards, it is necessary first to know the context in which the conduct occurred. Specifically, it is necessary to know whether, on the night in question, there was "a disturbance, such as occurred in [*Whitley v. Albers*], that indisputably pose[d] significant risks to the safety of inmates and prison staff...." *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed. 2d 251 (1986). In situations where prison officials are responding to an outbreak of violence, the appropriate standard is "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1084–85 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). In such emergencies, officials cannot be expected to measure nicely the precise amount of force necessary to restore order. However, where institutional security is not at stake, the officials' license to use force is more limited; to succeed, a plaintiff need not prove malicious and sadistic intent. Rather, Eighth Amendment liability will be imposed where the officials' actions involve the wanton and unnecessary infliction of pain as determined by the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted. *Wyatt v. Delaney*, 818 F.2d 21, 23 (8th Cir.1987). *See Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (deliberate indifference to prisoner's serious

---

**10.** Planchet, a prison guard at another prison and a part-time security guard at a senior citizens home, was not named as a defendant.

medical needs is cruel and unusual punishment).

In this case, the context in which defendants' contact with Unwin took place remains unclear. After discovery, there appears to be a genuine issue of material fact as to whether a "prison disturbance," as described in *Whitley*, actually existed. The record, construed in the light most favorable to Unwin, shows that, on the night in question, a dozen or so inmates were in the dayroom of the prison. Unwin, who had spent most of the earlier part of the day watching television and playing cards, was watching several inmates play cards in the dayroom. The other inmates were not doing anything in particular; a few were simply "hanging around," while others occasionally engaged in horseplay. None of the inmates in the dayroom were armed, drunk, or "acting out." There was intermittent noise emanating from the dayroom, although it is unclear whether the inmates or correctional officers were the source of it. There was various debris strewn about the dayroom floor, and some of the aluminum tables in the room were damaged; it is unclear how long the dayroom had been in such a state. At some point in the night, but after defendants had been called to the prison, an obstreperous inmate, who had earlier been ordered to remain in his cell, came out of his cell and entered the dayroom. This inmate, who was drunk, picked up a chair and threw it. Another inmate, in an attempt to subdue him, began to wrestle with the drunk inmate. The other inmates, including Unwin, were not involved in this struggle. It was after this that defendants and other law enforcement officers, who had come to the prison in response to an emergency call, entered the day room for the purpose of moving the inmates to their cells. There is no evidence indicating that the prison authorities or law enforcement officers had requested the inmates to return to their cells before the officers entered the day-room.[11] There is some evidence that after the officers had entered the room some of the inmates (not including Unwin) were asked to return to their cells but resisted. Other inmates returned to their cells on their own. As to Unwin, he was immediately knocked to the floor after the officers entered the dayroom, beaten, handcuffed, and then carried to his cell. All of the inmates were in their cells within five to ten minutes after the officers entered the dayroom.

We cannot say on the basis of this record that it was undisputed that there was a prison disturbance of *Whitley* magnitude on the night in question.[12] And with this material issue in dispute, we cannot adequately address the legal issue of whether the actions of each of the four defendants (Ellsworth, Curren, Terhune, and Sambatero) violated clearly established Eighth Amendment standards. Hence, it remains unclear whether to judge their contact with Unwin by a standard requiring Unwin to show that defendants acted maliciously and sadistically for the very purpose of causing harm. It is also unclear if this is a case within which to "balanc[e] competing institutional concerns for the safety of prison staff or other inmates." *Whitley*, 475 U.S. at 320, 106 S.Ct. at 1084. And it is a question of fact whether the four defendants acted with "objective legal reasonableness," *Anderson*, 107 S.Ct. at 3039, given all the circumstances. Answers to these fact-specific questions, which are essential to the qualified immunity inquiry, cannot be resolved in this case on summary judgment.

Consequently, defendants Ellsworth, Curren, Terhune, and Sambatero are not entitled to summary judgment on grounds of qualified immunity. A fuller factual foundation is necessary before the complex legal issue of qualified immunity can be resolved. *See* C. Wright, A. Miller & M. Kane, 10A *Federal Practice & Procedure* §§ 2725, 2728 (1983) (court has discretion to

---

11. There was some hearsay evidence in the depositions of such a request, but we cannot consider this in our analysis. *See* Fed.R.Civ.P. 32(a); J. Moore, 6 *Moore's Federal Practice* § 56.02[9], at 56–43 (2d ed. 1988).

12. For the reasons stated below at pages 129–130, *supra*, we also do not think Unwin conceded this issue in his complaint.

deny summary judgment where resolution of complex questions of law require a more concrete factual development than may be obtained through summary proceedings). *See also Berg v. Kincheloe,* 794 F.2d 457, 461–62 (9th Cir.1986) (summary judgment inappropriate where it was uncertain whether concern for prison security played a role in defendant's conduct).

## V. CONCLUSION

Defendants Furlone and Campbell are entitled to qualified immunity and we thus reverse the district court's denial of summary judgment on these grounds as to these two defendants. However, defendants Ellsworth, Curren, Terhune, and Sambatero are not entitled to qualified immunity at this stage of the proceedings, and we accordingly affirm the district court's denial of their motions for summary judgment on these grounds.

REVERSED IN PART AND AFFIRMED IN PART.

BREYER, Circuit Judge (dissenting).

I disagree with the court about the extent to which an appeals court should review purely factual determinations in the course of a "qualified immunity" interlocutory appeal. I would restrict our review of such factually-related matters.

1. To understand my conclusion one must begin by asking whether a defendant is entitled to an interlocutory appeal that raises *only* the question of whether a district court correctly decided to send a factual issue to a jury. Consider the following example: Plaintiff sues a policeman, claiming the policeman deliberately shot him without justification. The only dispute is one of identity; the defendant says he was out of town at the time of the shooting. The district court finds enough evidence in the record to create a jury issue in respect to identity; it denies defendant's motion for summary judgment. The only "legal issue" that the district court has decided is the peculiarly fact-bound legal issue of "evidence sufficiency." Can the defendant appeal *this* determination immediately, before trial on the ground that it is relevant to (indeed, determinative of) his "qualified immunity" defense?

The Supreme Court has not directly focused upon this question. In *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court wrote that it was important to permit interlocutory appeals in qualified immunity cases in order to protect the defendant against an unnecessary trial; but it analyzed the issue of appealability as follows:

> Similarly, it follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated. *An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law:* whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.[9] To be sure, the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief; the same is true, however, when a court must consider whether a prosecution is barred by a claim of former jeopardy or whether a Congressman is absolutely immune from suit because the complained of conduct falls within the protections of the Speech and Debate Clause. In the case of a double jeopardy claim, the court must compare the facts alleged in the second indictment with those in the first to determine whether the prosecutions are for the same offense, while in evaluating a claim of immunity under the

Speech and Debate Clause, a court must analyze the plaintiff's complaint to determine whether the plaintiff seeks to hold a Congressman liable for protected legislative actions or for other, unprotected conduct. In holding these and similar issues of absolute immunity to be appealable under the collateral order doctrine, the Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of the *Cohen* test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue.

Accordingly, we hold that a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law, is an appealable "final decision"* within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.

> 9 We emphasize at this point that the appealable issue is a *purely legal one:* whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law.

*Mitchell,* 472 U.S. at 527–30, 105 S.Ct. at 2816–18 (emphasis added, citations and footnote omitted).

This discussion shows that the Court had two examples in mind. In the first example, a district court concludes that, if the plaintiff's version of the facts is correct, the defendant does not enjoy qualified immunity (*e.g.,* the plaintiff says that a policeman defendant deliberately shot an innocent person without justification). The defendant might appeal, claiming that, even on the plaintiff's version of the facts, he enjoys qualified immunity. In the second example, the district court concludes that, even if the defendant's version of the facts is correct, he does not enjoy qualified immunity (*e.g.,* the defendant says that given the circumstances of the shooting, the law about justification was unclear, but the district court finds that the law was clear that he lacked justification). The defendant might appeal, claiming that the district court was wrong about the clarity of the law. In neither of these examples is the defendant challenging a fact-based legal determination that the evidence is sufficient to go to the jury.

The *Mitchell* Court does not discuss a third example. That is the situation I mentioned at p. 137, *supra.* The parties, perhaps, agree that, on plaintiff's version of the facts, there is no immunity, and on defendant's version, there is immunity. They disagree, however, about what the facts are. After reviewing depositions, affidavits, interrogatories, etc., the district court denies summary judgment and sends the case to the jury. The defendant, believing the evidence was not sufficient, wishes to appeal the refusal to grant him summary judgment. Of course, this appeal raises a "question of law," but it is the special, fact-specific legal question of whether the evidence in the record is sufficient to raise a factual issue for the jury.

The Supreme Court considered the "qualified immunity" appeal again in *Anderson v. Creighton,* 107 S.Ct. 3034 (1987). But again, it did not decide whether, or how, an appellate court is to review a factual, "evidence-sufficiency" ruling on interlocutory appeal. In *Anderson* the Court considered an appellate court's reversal of a district court's holding "that the *undisputed* facts revealed that Anderson had had probable cause to search the Creightons' home and that his failure to obtain a warrant was justified by the presence of exigent circumstances." *Id.* at 3037–38 (emphasis added). The Court held that the appellate court had wrongly "refused to consider the argument that it was *not* clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances." *Id.* at 3039. The Court said:

> The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.

*Id.* at 3040. But, in context, the "fact-specific question" the Court refers to is *not* the question of "what findings of fact will the evidence support?", but rather, the dif-

ferent, fact-based question of whether the defendant's *specific* conduct in his *specific* situation was, or was not, clearly prohibited by law, a question having nothing to do with disputes about the evidence.

The *Anderson* Court, in a final footnote, says that where the facts relevant to a motion for dismissal on qualified immunity grounds are in dispute, the district court must permit discovery "tailored specifically to the question of ... qualified immunity," before the "motion for summary judgment on qualified immunity grounds can be resolved." *Id.* at 3042 n. 6. But the Court does not say whether the defendant can appeal before trial, on the ground that the district court erroneously held that the evidence warrants submission of a "what-are-the-facts" question to the jury.

2. In my view, a defendant is not entitled to a "qualified immunity" interlocutory appeal in respect to a pure fact-based "evidence sufficiency" ruling. For one thing, the language and reasoning of *Mitchell* suggest that no interlocutory appeal is permitted. The Court, in the part of the opinion quoted at length above, said that the appellate court in an interlocutory appeal on qualified immunity, *"need not consider the correctness of the plaintiff's version of the facts. . . .* All it need determine is a *question of law." Id.* 472 U.S. at 528, 105 S.Ct. at 2816 (emphasis added). The Court emphasized in footnote 9 that "the appealable issue is a *purely legal one." Id.* at 528 n. 9, 105 S.Ct. at 2816 n. 9 (emphasis added). And, the Court's precise holding was that the denial of a qualified immunity claim is immediately appealable "to the extent that it turns on an *issue of law." Id.* at 530, 105 S.Ct. at 2817 (emphasis added). Of course, "sufficiency of the evidence" is a question of law, but the Court's language quoted above must mean to *distinguish* other, more purely legal questions *from* just this kind of "evidence-sufficiency" question. The Court's language would be meaningless otherwise, since *every* judicial act and *every* appeal involve decision of, or challenge to, a question of law. That is to say, unless the Court is distinguishing fact-based "evidence-sufficiency" questions

from *other* legal questions, it is not making any distinction at all.

For another thing, to permit interlocutory appeals of "evidence-sufficiency" questions will create difficult practical problems. Factual issues in § 1983 cases are often far more complex than my "misidentified policeman" example suggests. They often concern such nebulous matters as whether the defendant acted with "discriminatory intent," matters in respect to which a record may contain vast amounts of conflicting affidavits, depositions, and other discovery material. *See, e.g., Menzel v. Western Auto Supply Co.,* 848 F.2d 327, 329–30 (1st Cir.1988) (age discrimination claim turned on circumstantial evidence of discriminatory intent); *United States v. Massachusetts Maritime Academy,* 762 F.2d 142, 153–56 (1st Cir.1985) (court examined record in detail in reviewing trial court's finding of discriminatory purpose). Deciding whether the evidence is sufficient to go to the jury in such cases can take many hours of reading depositions, interrogatory answers, and other record material, filled with vague or ambiguous statements. Indeed, district courts in such cases may deny summary judgment *simply because the record is so complex* that, from the perspective of efficient judicial caseload management, it is best to send the case to the jury. 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2728 nn.11, 12 (1983 & Supp.1988). If the jury decides for the defendant, the case is over. If the jury decides for the plaintiff, the issue becomes one of sufficiency of the evidence at trial, not sufficiency of the often-less-comprehensible documentary evidence presented at the summary judgment stage. The summary judgment question has "washed out." We will not review a claim by a losing defendant that, even though there is a jury verdict against him supported by adequate evidence, the district court prior to trial (when the written record was sparser and harder to understand) should have granted summary judgment in his favor. *Benitez–Allende v. Alcan Aluminio do Brasil, S.A.,* 857 F.2d 26, 32 (1st Cir.1988) (district court may choose, in its discretion, to deny summary judg-

ment and give parties the chance to fully develop case by proceeding to trial); *see* 10A C. Wright, A. Miller & M. Kane, *supra.* We instead recognize the power of the district court to decide, for administrative reasons, that the more efficient course of action is simply to set the case for trial.

To permit a defendant to appeal an evidence-sufficiency issue prior to trial would seriously undermine the district court's case management powers. It would be anomalous to let a defendant force both a district court and an appeals court to pore over a complex record to decide whether the evidence is sufficient to go to a jury, when the practical solution in hard cases is simply to hold the jury trial. Indeed, if a district court knows that a defendant will immediately appeal, before trial, a decision to send a doubtful case to the jury, how can that court follow the Supreme Court's cautions against hastily granting summary judgment? *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (court should act "with caution in granting summary judgment," and deny it "in a case where there is reason to believe that the better course would be to proceed to a full trial").

These practical considerations convince me that the Supreme Court meant, in the *Mitchell* language quoted above, precisely what it said, namely that a qualified immunity issue is immediately appealable only when it presents a question of law *other than* the question whether the evidence was sufficient to raise a jury issue about a particular fact.

3. If I am right that a defendant cannot take an interlocutory appeal on a "sufficiency of the evidence" question, then the defendant also cannot require a court of appeals to decide such a question when it is added to an interlocutory appeal that does raise legitimate *Mitchell* issues. It is well established that, on an interlocutory appeal, we need consider only those issues that the defendant has a right to appeal immediately, and not other issues involved in the case. The Supreme Court's decisions since *Bonitz v. Fair,* 804 F.2d 164 (1st

Cir.1986), have not cast doubt on our statement that a defendant does not obtain a general right to appeal an adverse ruling on summary judgment simply by raising a qualified immunity defense; any other ruling he seeks to challenge on appeal must independently qualify as a final, appealable order. *Id.* at 173–74; *see also Lugo v. Alvarado,* 819 F.2d 5, 8 (1st Cir.1987) (interlocutory review of discovery order not permissible just because defendant raised qualified immunity defense). Were this not so, a defendant could concoct a plausible (but incorrect) claim that the district court made a mistake about whether the law was clearly established, and thus obtain appellate review of the very same fact-based questions that should not be immediately appealable, under *Mitchell. See Bonitz,* 804 F.2d at 174 (to allow immediate appeal whenever a defendant can frame his arguments in terms of qualified immunity would, in effect, eliminate the final decision requirement for defendants who are public officials).

4. The following problem remains: If we are to decide qualified immunity questions of law on interlocutory appeals, but not "evidence sufficiency" questions of fact, what facts should we assume when we decide a question of law? In *Bonitz,* we held that we should look to the plaintiff's version of the facts. *Id.* at 167–68. That need not hold true in every circumstance. If, for example, the district court has conducted discovery before deciding the qualified immunity issue, *see Anderson v. Creighton,* 107 S.Ct. at 3042 n. 6, and if it has decided there is sufficient evidence of defendant's liability to go to the jury, we could take the facts as the district court assumed the jury might find them. We could then go on to ask whether the district court correctly determined, given such facts, that the law prohibiting defendant's conduct was clearly established. Or, in a case where the parties on appeal agree that certain facts exist, we could take the facts as agreed. It is even possible, in some cases, that it would be useful and proper for us to examine the record to establish the relevant undisputed facts. I would not say we could *never* look at the record to

establish the facts; it might expedite the handling of a particular appeal were we to do so. I would say only that we *ordinarily* should not go into questions of "evidence sufficiency" on an interlocutory appeal, and that the defendant has no legal right to compel us to do so; I see no significant difference between granting the defendant such a right and granting him the broad interlocutory appeal that, in my view, the Supreme Court has denied him for reasons set out at pp. 139–140, *supra.*

5. In this case, I see no real issue on appeal, in respect to the defendants Campbell and Furlone, other than the purely factual issue whether the evidence shows that they were present at the time plaintiff was hurt. This, it seems to me, is not an appropriate issue for us to resolve on an interlocutory appeal. The occasion for us to consider the legal sufficiency of the evidence on this factual issue is after the trial. If the district court submits the issue to the jury, if the defendants lose, and if the district court refuses to grant a judgment notwithstanding the verdict, then they can appeal that refusal. They then can argue, in the course of an ordinary appeal, that there is insufficient evidence of their presence when the plaintiff was hurt. Although these defendants, like defendants in most cases, are likely to object to potentially unnecessary trials on purely factual issues, the alternative would produce complex administrative problems and violate the spirit, if not the letter, of *Mitchell*'s grant of an interlocutory appeal limited to "questions of law."

For these reasons I would affirm the district court decision in its entirety.